

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. PD-502-06

**NICHOLAS GEORGE KLEIN, Appellant**

**v.**

**THE STATE OF TEXAS**

## ON STATE'S PETITION FOR DISCRETIONARY REVIEW
## FROM THE SECOND COURT OF APPEALS
## DENTON  COUNTY

HERVEY, J., delivered the opinion of the Court in which KELLER, P.J., MEYERS, KEASLER and HOLCOMB, JJ., joined. PRICE, J., filed a concurring and dissenting opinion in which WOMACK, JOHNSON and COCHRAN, JJ., joined. COCHRAN, J., filed a dissenting opinion in which PRICE, WOMACK and JOHNSON, JJ., joined.

## O P I N I O N

Appellant was charged in an eight-count indictment with aggravated sexual assault of a child.

The complainant in this case is appellant's daughter, who is a gifted child with a genius-range IQ

of 147.  When she was ten years old, the complainant told a school counselor (Batchelder) that

appellant had sexually abused her.  Very soon after this, the complainant repeated these accusations

to a CPS investigator (Todd) and to a police investigator (Cook). The complainant subsequently recanted these accusations against appellant. During the State's direct examination of the complainant at appellant's trial almost two years later, the complainant reaffirmed her recantation and testified that appellant did not sexually abuse her. The complainant, however, also testified on direct examination by the State that appellant did sexually abuse her. Appellant's lawyer claimed that the complainant's direct-examination testimony that appellant did sexually abuse her was influenced by the State's trickery in questioning her. The trial court decided that this assertion allowed the State to introduce into evidence the complainant's prior out-of-court statements to Todd and Cook to show that the complainant said the same thing without any "trick" questions from the State. The jury convicted appellant of all eight counts and sentenced him to ten years imprisonment on count 1 and ten years community supervision on the other seven counts. On direct appeal, the court of appeals decided that the evidence is legally insufficient to support appellant's convictions on counts 1 through 6 and that the trial court reversibly erred in admitting into evidence the complainant's prior out-of-court statements to Todd and Cook that appellant had sexually abused her. *See Klein v. State*, 191 S.W.3d 766, 771-75, 781-85 (Tex.App.–Fort Worth 2006). The court of appeals entered a judgment of acquittal on counts 1 through 6 and reversed and remanded for a new trial on counts 7 and 8. *See Klein*, 191 S.W.3d at 785. We will reverse.

**Ground 1 (legal sufficiency)**

The indictment in this case alleged in eight counts that appellant sexually assaulted the complainant twice on each of four separate occasions. Counts 1 and 2 of the indictment alleged that appellant penetrated the complainant's sexual organ with his finger (count 1) and that he caused the complainant's sexual organ to contact his mouth (count 2) "on or about" June 1, 2000. Counts 3 and

4, respectively, alleged that appellant engaged in the same conduct "on or about" December 1, 2000. Counts 5 and 6, respectively, alleged that appellant engaged in this conduct "on or about" May 1, 2001. And, counts 7 and 8, respectively, alleged that appellant did this again "on or about" November 1, 2001.

The record reflects that the complainant made her outcry to Batchelder on January 11, 2002, when the complainant was in the fifth grade during the 2001-2002 school year.[1] The record fairly reflects that the State presented evidence that appellant touched the complainant "between [her] legs" with his fingers and with his tongue "most nights" when the complainant's mother was at a dance class. The outcry witness (Batchelder) testified:

> Q. [STATE]: When [the complainant] said the phrase about the door locking, what did that do–or what did that indicate to you?
>
> A. [BATCHELDER]: Well, it was a red flag. So even though I was listening hard before, I listened, you know, even harder.
>
> Q. And why would that be a red flag?
>
> A. You know, [the complainant] wanted to lock her door from something. She liked having her door locked. So why? I didn't know why, but I was worried about why.
>
> Q. After she said that she locks her door but now her father fixed it so she can't lock her door, what did you do?
>
> A. I just repeated it back: So you like to lock your door sometimes. She goes, yes.
>
> Q. Then what did [the complainant] say?
>
> A. Well, then she gets quiet again, you know, and then she gets her courage up and she says, sometimes he messes with me.

---

[1] We further understand the record to reflect that appellant had no opportunity to sexually assault the complainant after January 11, 2002.

Q. Okay.  And what did you do when she told you that sometimes he messes with her?

A. Well, I said, what does messes with me mean?

Q. And how did she respond?

A. She said, he tickles me, and she stopped a long time.  I said, so sometimes he tickles you.  She goes, yeah.  And then she finally says, and sometimes he touches me between my legs with his hands, and sometimes he uses his tongue.

Q. Did she say hands or did she say fingers?

A. Fingers.

* * *

Q. Now, after she told you that, what happened?

A. Then she wanted me to know about her dance lessons that she and her mother took.

Q. She wanted you to know about that?

A. She told me so.

Q. What did you do when she told you about the dance lesson?

A. I listened.  She said she took dance lessons and her mother took them right after her.  And she said, I always try to get mom to let me stay and watch her take her dance lessons.

Q. Let me stop you there for a second.  Were the dance lessons important to her?

A. I don't know.  The story was important to her.

Q. What was–okay.  Go ahead and continue the story.

A. And she said, I liked–I always begged mother to let me stay and watch the dance lessons because when she doesn't, [appellant] picks me up.  And when we get home, he puts the little ones to bed and then he messes with me.

Q. What did you do or say when she told you that?

A. I reflected back what she said.

Q. And then what happened?

A. And she said yes. Oh, then I–by that time I knew I was going to be making a report to CPS. So I said, how often does he mess with you? And she said, it happens most nights.

The record also fairly reflects that other evidence was presented that appellant touched the complainant's vagina with his fingers and with his tongue "many times" when her mother was at a dance class on Monday nights. The CPS investigator (Todd) testified:

Q. [STATE]: Did she eventually talk to you about things that were inappropriate touching?

A. [TODD]: She did.

Q. And what did she tell you about that?

A. She indicated that [appellant] had come into her room, touched her on her vagina with his fingers and with his tongue.

Q. Did she say how often this occurred?

A. Many times I believe was her answer.

Q. Did she talk about any particular time that this would happen, anything that occurred with any frequency?

A. She spoke of her mother going to dance classes on Monday night, and she said she never–she always wanted to stay at dance or go with her mother and then stay with her mother. Because if she went home, her siblings would be in bed, and then [appellant] would–it would just be her and [appellant] there, and she spoke of it occurring during this time.

The complainant testified at trial that she did not remember which nights her mother went to dance class. She testified that she had a dance class before her mother's dance class and that her mother would take her home after her dance class. The complainant testified that her mother would then "go back to take her [dance] class."

Q. [STATE]: Did your mom take a dance class?

A. [COMPLAINANT]: Yes.

Q. What nights did she go to dance class?

A. I don't know.

Q. Did she go one night a week or more than one night?

A. I don't really remember.

Q. Did you also take a dance class at the same time?

A. Yes.

Q. Was yours before hers or after hers?

A. Before.

* * *

Q. When the two of you would go to dance class, would you always stay with your mom or would sometimes you go home while she took the class?

A. I would go home.

Q. How would you get home?

A. She would drive me.

Q. So you would go to your class and she would stay with you while you took your class?

A. Yes.

Q. And then she would take you home and then she would go back to class?

A. Yes.

The complainant's mother testified that she had a dance class "scheduled every Monday night" when the complainant was "in fifth grade," but that she did not "always make it." Appellant also testified and claimed that the mother's dance class lasted for only a short period of time,

"between six to eight weeks." Evidence was also presented that the last time that appellant sexually assaulted the complainant was in November 2001.

The court of appeals decided that the evidence is legally sufficient to support a finding that appellant sexually assaulted the complainant twice during only one of the incidents alleged in the indictment (counts 7 and 8 alleging commission of the offenses "on or about November 1, 2001"). *See Klein*, 191 S.W.3d at 774-75. The court of appeals decided that the evidence is legally insufficient to support appellant's convictions on the other counts (counts 1 through 6), "because the record is void of any specific evidence of separate incidents constituting commission of additional offenses." *See Klein*, 191 S.W.3d at 774. We granted the State's petition to review this decision. Ground one of the State's petition for discretionary review states:

> Did the court of appeals err in holding that the evidence was not legally sufficient to prove that [appellant] sexually abused his daughter on four separate occasions as alleged in the indictment when the evidence showed that the abuse happened on Monday nights when the child's mother was at a dance class and when the mother took the dance class for a period encompassing at least eight weeks.

The State claims that the evidence shows "multiple and distinct offenses of aggravated sexual assault by reference to the Monday-night dance class of the child's mother." We understand the State to argue that the evidence supports a finding that the sexual assaults occurred "on at least four separate occasions" from "April or May of 2001 through May of 2002" while the complainant's mother was at dance class on Monday nights during this period of time.[2] The State also argues that

---

[2]

With references to the record omitted, we set out portions of the State's brief on discretionary review:

[The complainant] testified and told others that she was sexually abused multiple times by her father. The girl told the outcry witness that the abuse happened on "most nights" when the mother was at dance class. The girl told a CPS investigator

the court of appeals ignored "some of the evidence most favorable to the verdict" and instead relied on the "self-serving testimony of [appellant] himself, that [the mother's] dance class lasted only six to eight weeks." The State further argues that even this self-serving testimony shows "six to eight separate occasions on which the sexual assault could have happened when only four separate occasions were alleged."

The legal-sufficiency appellate standard of evidentiary review requires the reviewing court to view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This "familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence,

---

that the abuse would occur on Monday nights when her mother was at dance class. [The complainant] testified that her mom took dance class when she went to McCoy Elementary and the family lived in Carrollton, Texas. The mother testified that the family moved to Carrollton in January or March of 2000 and that [the complainant] transferred to McCoy Elementary in April or May of 2001 at the end of the fourth grade. [The complainant] and a classmate testified that she attended McCoy Elementary through the fifth grade. The mother confirmed she attended dance class on Monday nights when [the complainant] was in the fifth grade. [Appellant] himself testified that [the complainant's] mother was out of the house on a regular basis attending dance class, but he claimed the dance class lasted only six to eight weeks. [Appellant] admitted he was home alone with [the complainant] while the child's mother was at dance class. The girl told the investigating officer that the last time the abuse happened was in November of 2001.

Putting all this evidence together, and viewing it in a light most favorable to the verdict, it is clear a jury could have rationally determined that [appellant] abused his daughter while the girl's mother was at dance class on Monday nights over an extended period of time. The evidence most favorable to the verdict shows the dance class took place while [the complainant] was attending McCoy Elementary, i.e., from April or May of 2001 through May of 2002. Clearly, there were many separate Monday nights in this time period allowing the jury to rationally determine that the sexual assaults happened on at least four separate occasions prior to the presentment of the Indictment and within the statute of limitations period.

and to draw reasonable inferences from basic facts to ultimate facts." *See id*.

We find it unnecessary in this case to decide whether the evidence supports a finding that the sexual assaults occurred "on at least four separate occasions" from "April or May of 2001 through May of 2002" while the complainant's mother was at dance class on Monday nights during this period of time. At the very least, the evidence supports a finding that appellant sexually assaulted the complainant "on at least four separate occasions" during the mother's Monday night dance classes when the complainant was in the fifth grade in the fall of 2001.[3] We agree with the State that a rational jury could find that the sexual assaults occurred during this period of time "on at least four separate occasions" during the Monday night dance classes even if they lasted only six to eight weeks as referenced in appellant's "self-serving" testimony. The evidence that appellant touched the complainant's sexual organ with his fingers and with his tongue "most nights" or "many times" when the complainant's mother was at dance class on Monday nights is "specific evidence of separate" sexual assaults that occurred "on at least four separate occasions" during this six to eight week period of time. *See Ex parte Pruitt*, 233 S.W.3d 338, 340-41 (Tex.Cr.App. 2007)

---

[3] On this record, it would be difficult to conclude that the evidence supports a finding that appellant sexually assaulted the complainant in "April or May of 2001" before the beginning of her fifth grade school year in August or September 2001, since the evidence seems only to indicate that appellant sexually assaulted the complainant when the mother went to her Monday night dance classes during the complainant's fifth-grade school year. It would also be difficult to conclude that the evidence supports a finding that appellant sexually assaulted the complainant after November 2001, since the evidence seems to indicate that the last assault occurred in November 2001. And, even if the evidence did not so indicate, it would also be difficult to conclude that the evidence supports a finding that appellant sexually assaulted the complainant after the complainant made her outcry to Batchelder on January 11, 2002, since appellant apparently had no opportunity to do so after the complainant's outcry to Batchelder. *See* Footnote 1. We, therefore, confine our sufficiency analysis to whether the evidence supports a finding that appellant sexually assaulted the complainant "on at least four separate occasions" during the complainant's fifth grade school year in the fall of 2001 and through November 2001.

(complainant's testimony that defendant penetrated her sexual organ with his penis "at least once a month" between first incident of penetration in summer of 1998 and the last incident of penetration in August or September of 2000 sufficiently described each incident of penetration during this period of time); *Dixon v. State*, 201 S.W.3d 731, 734 (Tex.Cr.App. 2006) (The complaining witness "described the manner in which [defendant] sexually assaulted her and said that it occurred numerous times. Consequently, *all* of the incidents presented in the case were presented with equal specificity, and, except for the fact that one incident occurred during the day, none of the incidents were distinguished in any manner from each other.") (emphasis in original).[4] The court of appeals,

---

[4]

For example, a rational jury could have found beyond a reasonable doubt that appellant came into the complainant's room and "touched her on her vagina with his fingers and with his tongue" on each of at least four separate occasions when the complainant's mother was at dance class. *But see* Concurring and dissenting op. at 1-2 (Price, J., concurring and dissenting) (suggesting that evidence does not support such a finding). Todd testified:

> Q. [STATE]: Did [the complainant] eventually talk to you about things that were inappropriate touching?
>
> A. [TODD]: She did.
>
> Q. And what did she tell you about that?
>
> A. **She indicated that [appellant] had come into her room, touched her on her vagina with his fingers and with his tongue.**
>
> Q. Did she say how often this occurred?
>
> A. Many times I believe was her answer.
>
> Q. Did she talk about any particular time that this would happen, anything that occurred with any frequency?
>
> A. **She spoke of her mother going to dance classes on Monday night**, and she said she never–she always wanted to stay at dance or go with her mother and then stay with her mother. Because if she went home, her siblings would be in bed, and then

therefore, erred to decide that "the record is void of any specific evidence of separate incidents constituting commission of additional offenses." *See Klein*, 191 S.W.3d at 774.[5]

---

[appellant] would–it would just be her and [appellant] there, **and she spoke of it occurring during this time**.

(Emphasis supplied).

[5]

Appellant claimed in the court of appeals that the evidence is legally insufficient to support his convictions because the evidence is too "vague and general and did not contain any specifics as alleged in the indictment." Appellant made no claim that the evidence is insufficient because of a variance between the dates of the sexual assaults and the nonelemental "on or about" dates in the indictment. *See Malik v. State*, 953 S.W.2d 234, 239-40 (Tex.Cr.App. 1997) (evidentiary-sufficiency measured only by the elements of the offense). Consistent with Texas jurisprudence dating back to about 1870, the jury was instructed that "the State is not required to prove the exact date alleged in the indictment but may prove the offense if any to have been committed at any time prior to June 20, 2002, the presentment date of the indictment, so long as said offense, if any, occurred within ten years of the date of the presentment of the indictment." *See, e.g., Mireles v. State*, 901 S.W.2d 458, 463-70 (Tex.Cr.App. 1995) (Meyers, J., dissenting) (discussing this "on or about" jurisprudence and noting that "this Court has invariably overruled complaints about a variance between the pleading and proof of relevant dates, even if the discrepancy is as much as several years").

Appellant seems to make a completely different claim on discretionary review by arguing that the court of appeals opinion correctly decided that "the State wholly failed to elicit any evidence which would tie" the "on or about" dates alleged in counts one through six of the indictment to the evidence presented at trial. We do not so read the court of appeals' opinion. *See Klein*, 191 S.W.3d at 774-75 (evidence legally insufficient to support appellant's convictions on counts one through six "because the record is void of any specific evidence of separate incidents constituting commission of additional offenses"). It appears that the court of appeals declined to address whether the evidence was sufficient to support eight counts in terms of the "on or about" allegations. Rather, the court of appeals found the evidence insufficient to support six instances of criminal conduct during a small portion of the time period alleged. Therefore, the applicability of our "on or about" jurisprudence arguably is not presented in this case with the only issue presented being the sufficiency of the evidence to support a finding that appellant sexually assaulted the complainant "on at least four separate occasions."

In addition, appellant does not discuss or demonstrate why his belated complaint "about a variance between the pleading and proof of relevant dates" should not be overruled under this Court's "on or about" jurisprudence. *See Barfield v. State*, 51 S.W. 908 (Tex.Cr.App. 1899) (overruling such a complaint when indictment alleged that defendant committed the offense in 1898 and evidence showed that defendant committed it in 1896); *Mireles*, 901 S.W.2d at 463-70 (Meyers, J., dissenting) (noting that "this Court has invariably overruled complaints about a variance between the pleading and proof of relevant dates, even if the discrepancy is as much as several years").

**Ground 2 (admission of complainant's out-of-court statements to Todd and Cook)**

The record reflects that, after the complainant testified, Todd and Cook testified, over appellant's hearsay objections, that early in the investigation the complainant made out-of-court statements to them that appellant had sexually abused her. The trial court admitted this testimony as substantive evidence of appellant's guilt under TEX. R. EVID. 801(e)(1)(B). In relevant part, this rule provides that a declarant's out-of-court statement is not hearsay if the declarant testifies at trial and is subject to cross-examination concerning the statement, and the statement is "consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive[.]" *Id.*

We view the evidence in the light most favorable to the trial court's ruling admitting Todd's and Cook's testimony. *See Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Cr.App. 1997) (trial court's evidentiary rulings reviewed on appeal under abuse of discretion standard); *see also Hammons v. State*, 239 S.W.3d 798, 806 (Tex.Cr.App. 2007) (trial court's admission of evidence under rule 801(e)(1)(B) is reviewed only for an abuse of discretion). The evidence shows that the complainant told Batchelder on January 11, 2002, that appellant had sexually abused her. The complainant repeated these accusations to Todd and Cook in the out-of-court statements at issue here. The record also supports a finding that appellant and the complainant's mother began to pressure the complainant to recant her accusations against appellant very soon after the complainant accused appellant of sexually abusing her.[6] And, the complainant did recant these accusations within about

---

[6] The record also supports a finding that appellant and the complainant's mother continued to influence the complainant up to and including trial to say that appellant did not sexually abuse her.

two weeks after her outcry to Batchelder.[7]

_____

[7]

For example, Cook testified at trial that the complainant repeated her accusations against appellant during his interview of her at her school on January 17, 2002. On January 29, 2002, Cook received a call from the family's lawyer, who informed Cook that the complainant had recanted to her mother. Cook interviewed the complainant again at her school on January 30, 2002, and the complainant told him that her recantation to her mother was a lie. Later that day, the complainant called Cook at his office and told him that she "made it all up." The complainant told Cook that she got his phone number from her mother. Cook did not speak to the complainant after that. Cook testified about the telephone conversation with the complainant on January 30, 2002, during which she told him, after speaking with her mother, that she "made it all up."

Q. [STATE]: Now, later that day did you receive another phone call?

A. [COOK]: Yes, I did.

Q. And who did you receive a phone call from later that evening or afternoon?

A. I was sitting at my desk, and I received a telephone call at my desk from [the complainant].

Q. And when you answered the phone, how did you learn or know that that was [the complainant]?

A. She identified herself by saying, It's [the complainant].

Q. And then what did you do?

A. I said–at first I didn't understand what she'd said because she was speaking very quickly. And I asked her to repeat herself, and she said, it's [the complainant]. And then I said okay, [complainant], what can I do for you?

Q. What did she say to you then?

A. The next thing she said, again very quickly, was, I made it all up.

Q. And then what happened?

A. And I was–at that point I was shocked that she had called me at my desk. I had never given her a business card due to her age. Commonly I would give a witness my business card with my contact information on it, but as I said, due to her age I had not done that. And I began to wonder how it was that she came to have the telephone

At trial, the complainant spent most of her time on direct examination by the State denying that appellant had sexually abused her. But, the complainant also testified on direct examination that appellant did sexually abuse her.

Q. [STATE]: Do you have a pretty good memory?

A. [THE COMPLAINANT]: Yes.

Q. And how old can you–how old were you that you have memory of? How far back can you remember?

A. I can remember certain things but–like really far back, but only certain things I can remember.

Q. So you don't remember exactly when it first started?

A. No.

Q. What's the first time that you remember?

---

number, my direct telephone number to my desk.

Q. So what did you do?

A. I asked her if her mother had given her my telephone number.

Q. And what did she tell you?

A. She told me that–she said very quickly yes, but it was my idea to call.

\* \* \*

Q. Did you have any more conversation with [the complainant] after she told you that it didn't happen?

A. I remember the conversation ending very quickly after that. I told her–I thanked her for calling me and told her I would–you know, I would follow up on that.

Q. Did you have any contact with [the complainant] after that phone call?

A. No, I don't remember having any further contact with [the complainant] after that particular phone call.

A. I don't really know.

Q. What's the last time that you remember?

A. I can't remember, really, because–I just can't.

Q. Is it hard to talk about?

A. No, I just can't remember.

Q. Are there any times that you remember enough to where you can describe them in court?

A. Yes.

Q. Tell us about a time that you remember.

[DEFENSE]: Your Honor, I'm going to object. She hasn't asked her what it is that she does remember.

[COURT]: Overruled.

Q. That means you can answer.

A. I was in my bed, and he came in.

Q. What happened when he came in?

A. He did what I told [Batchelder].

Q. You told her that he touched you with his fingers on your vagina and put his tongue on your vagina.

A. Yes.

Q. Is that what happened?

A. You mean then or at all?

Q. Is that what happened the time that you're telling us about?

A. Yes.

Q. Did that happen one time or more than one time?

A. More than one time.

Q. Did it happen–you said that you lived in Carrollton. Did it happen any other places besides your house in Carrollton?

A. No.

Q. How old were you when you first moved to Carrollton?

A. Eight or nine, I think

Q. Did you–you said that you went to fourth grade in Carrollton, all of fourth grade, right?

A. Yes.

Q. Did you go to third grade at all in Carrollton?

A. I think so. I think the end of the year I did.

Q. Was that at Homestead Elementary? Does that sound familiar?

A. Yes.

Q. The time that you've told us about and the other times that happened, you said those were all at your house in Carrollton. Is that right?

A. Yes.

Q. Did that happen at night or during the day?

A. Night.

Q. Where was your mom when this was happening?

A. I don't remember.

Q. Was she awake as far as you know?

A. I don't think so.

Q. Was she gone or was she asleep?

A. She was probably gone.

Q. Where was she gone?

A. To, like, dance class, maybe.

Q. And would this happen in your room or another room in the house?

A. My room.

Q. Do you know where your brothers and sisters were?

A. They were sleeping.

Just after this, the complainant reiterated before the jury on direct examination that appellant did not sexually abuse her and that her recent and untrue or fabricated direct-examination testimony that appellant did sexually abuse her was influenced by a misunderstanding of the State's questions.

Q. [STATE]: Did you ever tell anyone that what you told Ms. Batchelder wasn't true?

A. [COMPLAINANT]: Yes.

Q. And who was the first person that you told that to?

A. My mom.

Q. How come you told your mom that?

A. Because she–because it didn't, and she is a person I can trust.

Q. Because it didn't and she's a person that you can trust?

A. Yes.

Q. Explain that to us.

A. Like, I felt that I could tell her because I made a mistake, and it's hard to tell somebody when you make a mistake.

Q. What did you make a mistake about?

A. About saying something that didn't–that wasn't true.

Q. I'm confused. What did you say that wasn't true?

A. I said that my dad touched me, and it wasn't true.

Q. But you just told us that it happened.

A. I thought you were referring to what I said, so. . .

On cross-examination by the defense, the complainant testified that appellant did not sexually abuse her and that she lied when she initially accused him of sexually abusing her. She also testified on cross-examination that on several occasions she "tried to tell the prosecutors that these allegations were not true."[8] The complainant's direct-examination testimony, set out above, that appellant did sexually abuse her was not mentioned on cross-examination.

After the complainant testified, the State called Todd to testify. Appellant objected to Todd's testimony as "impermissible hearsay to impeach" the complainant. Claiming that the complainant consistently testified on direct examination and on cross-examination that appellant did not sexually abuse her, appellant asserted that the State could not use the complainant's out-of-court statements to Todd as prior inconsistent statements for impeachment purposes, particularly since the State knew that the complainant would recant at trial.[9] We also understand the record to reflect that appellant also claimed that, if the trial court admitted the complainant's out-of-court statements to Todd, then it should instruct the jury that it could consider them only for impeachment purposes and not as

---

[8]

The trial court would not have abused its discretion to view the complainant's cross-examination testimony that appellant did not sexually abuse her as an implicit charge by the defense that the complainant's recent direct-examination testimony that appellant did sexually abuse her was untrue or fabricated. *See Hammons*, 239 S.W.3d at 808-09 (trial court is uniquely positioned to assess cross-examiner's tone, tenor, and demeanor).

[9]

*See generally Hughes v. State*, 4 S.W.3d 1 (Tex.Cr.App. 1999) (*cited* in *Klein*, 191 S.W.3d at 782).

substantive evidence of guilt.[10]

> [DEFENSE]: Now the defense would object to the calling of [Todd], the CPS worker that interviewed [the complainant], and that the prosecutor has continually referred to that interview. We could not object before now.
>
> We anticipate that she's calling [Todd] in an effort to introduce impeachment, prior inconsistent statements that the child has made. We would object on the basis that it is improper, that she cannot do it, and we would cite the court to two cases: [citations omitted].
>
> Our specific objection is that because [the complainant] has hit the stand and recanted, and recanted consistently, the State knew she was going to recant, that they at any time then turn around and try to get in what is impermissible hearsay to impeach the child because it's inadmissible. And these two cases call it a straw man theory and say it's inadmissible. And we would object to [Todd] testifying regarding any interview that she had with [the complainant]. And I'll give the court–
>
> * * *
>
> I will hand you my handwritten request. I'll let you look at it first, your Honor, and you can hand it to her. It's my handwritten request that the jury be instructed.
>
> And here is my point, your Honor. Whether those statements come in or not, they are not probative of any fact except to say that [the complainant] said something different before. The only evidence in front of this jury that this offense ever may have happened–if they don't believe [the complainant] at all, they can say, well, we believed her before. But there's no testimony in front of them except for the outcry witness.

The State responded that it did not "know for sure" that the complainant would recant when the State called her to testify at trial.

> [STATE]: Your Honor, I've worked with cases involving kids for many, many years. I've worked criminal cases for a very long time. And what that's taught me is until the witness is up there testifying, you don't know for sure what they're going to say.
>
> And I think that was borne out by the fact of [the complainant's] testimony today. I expected she might recant. Did I know for certain? I did not. I have talked to her beforehand, and she told me it didn't happen. I still don't know what the child is going to say when she gets up on the witness stand. I've had it happen both ways,

---

[10] Appellant later made the same objections to Cook's testimony.

where kids have recanted prior to trial and they take the stand and say the sexual abuse happened. I've had kids tell me ahead of time the sexual abuse happened; they take the witness stand and recant and say nothing happened. So until [the complainant] hit the witness stand, I didn't know for sure what she was going to say. In fact she gave testimony it in fact happened, or that's how it could have been interpreted by the jury.

So I don't think the cases cited by the defense counsel apply, and I don't think the balancing test that they refer to is one that would prevent us calling [Todd] and asking her questions about what [the complainant] told her.[11]

The admissibility hearing centered almost entirely on whether the complainant's trial testimony was conflicting on whether appellant sexually abused her.[12] The State claimed that the complainant did testify on direct examination that appellant sexually abused her, making her testimony conflicting on this issue.[13] The State apparently claimed that, under these circumstances, the complainant's out-of-court statements to Todd were admissible not only for impeachment purposes but also as substantive evidence of appellant's guilt (apparently under rule 801(e)(1)(B)).

Appellant claimed that any testimony by the complainant at trial that appellant sexually abused her was improperly influenced by the State trying "to seduce" the complainant with "some sort of manipulation of lawyer questions." Appellant claimed that it would be "disingenuous" to focus only

---

[11] Based on this, the trial court could reasonably have found that the State did not "know for sure" what the complainant's testimony would be.

[12] The parties apparently believed it to be critical whether the complainant testified at trial that appellant sexually abused her since one of the elements of admissibility under Rule 801(e)(1)(B) is that the declarant's prior out-of-court statement (in this case the complainant's prior out-of-court statements to Todd and Cook that appellant sexually abused her) is "consistent with the declarant's testimony" at trial.

[13] The court of appeals also agreed that the complainant's trial testimony was conflicting on whether appellant sexually abused her. *See Klein*, 191 S.W.3d at 781 (noting that the complainant's trial testimony was "internally conflicting") and at 782 (noting that the complainant's trial testimony was "self-conflicting").

on part of the complainant's testimony "without looking at her testimony as a whole."

> [COURT]: What about the testimony this morning?
>
> [DEFENSE]: I'd like you to read it back.  Because what the State did was try to seduce her to say do you remember when it started happening.  When that child was asked directly what do you remember, she said it did not happen, I thought you were asking me about what I told other people.  That's in the record.  There's no debate about that.
>
> * * *
>
> [COURT]: What about her answer when she said, he did what I told the counselor?
>
> [DEFENSE]: I'd like to read it in context.  Because when I wrote it down, she said that that's what he told her.  She didn't say–she never said–in the whole tenor of her stuff, Judge, she never once–when she was questioned in plain language instead of through some sort of manipulation of lawyer questions, that child's testimony never, ever backed up.  She said over and over again he did not do it.  And if the judge–if you have any question, I would like to have the–that portion of the testimony, that portion of the record regarding that, I'd like to have you review it in camera and just be sure because–
>
> [COURT]: I'm reviewing it right now.

After reviewing the complainant's testimony, the trial court found that the complainant, in fact, testified that appellant sexually abused her.

> [COURT]: Based on my review of her testimony and as I remember her testimony–and when I say "her," I mean [the complainant]–I think that she testified to it and then changed her story on the stand at this point when [the State] began asking her whether or not she told anyone–or did you ever tell anyone that what you told Ms. Batchelder wasn't true, and it comes down to she told her mom.  How come you told your mom that?  Because she, and then there's a break, and then she starts and says, because it didn't and she's a person I can trust.
>
> So I think what we have here, just to make it more confusing, is testimony by the [complainant] in this case that it did happen and it didn't happen.  So that makes each statement consistent and inconsistent.  And that's in light of all the–her testimony, demeanor on the stand.[14]

---

[14]

On this record, we cannot say that the trial court abused its discretion to find that the complainant's trial testimony was "that it did happen and it didn't happen."  *See Hammons*, 239

The trial court ultimately ruled that the complainant's out-of-court statements to Todd (and Cook) would be admissible under rule 801(e)(1)(B) because there was "an express or implied charge of improper inference (sic) or motive."

> [COURT]: I think it's a consistent statement when she says–when she makes the statement to the question, what happened when he came in? He did what I told the counselor. At no point–she's saying that that's what happened. She's not–
>
> [DEFENSE]: And she misunderstood the question, and it was clear later on in the testimony that she did, your Honor. Singling on the one statement that's–I object seriously to that. Singling it on [sic] one statement, not taking the testimony as a whole, and turning around and saying it's consistent I don't think is legally–
>
> [COURT]: Okay.
>
> [DEFENSE]: –substantiated.
>
> [COURT]: Why don't we talk more about what she said. Did it happen more than one time? Yes, it did.
>
> [DEFENSE]: But she said she was talking about what she told somebody else. So if you don't–that's fine, but they're offering them as inconsistent statements to show the jury she's not telling the truth or that she told somebody else something else. I strenuously object, and I ask for that instruction to the jury.
>
> [COURT]: And I believe that if that was the only reason, then you'd at least be entitled to this instruction and there would be a question of whether it comes in at all. But after seeing her demeanor and her testify and then reviewing it again, I'm going to rule that it's not hearsay, that it's consistent with her testimony, and that there is an express or implied charge of improper inference [sic] motive. So I'm denying your request.

And, during closing jury arguments, appellant made the express charge to the jury that any testimony by the complainant at trial that appellant sexually abused her was improperly influenced by the State's trickery.

---

S.W.3d at 808 (reviewing court should defer to trial court's assessment of tone, tenor, and demeanor).

[DEFENSE]: Why do people hate lawyers so much? I think you saw some of it. We have a thing that we do sometimes when we start questioning witnesses. And we say, Mr. So and So, and we ask them a series of questions based on whatever it is we want to. And then we slip in a question and we say, now, when did this start happening? When did you start beating your wife? How long has he been beating you? Before you ever get any testimony or ever hear that it ever did happen. And the witness gets on a roll, thinks they're answering something else, and answers you, and then all of a sudden you've contradicted yourself.

\* \* \*

What is the proof that you had where you can prove beyond a reasonable doubt that it didn't happen? You have [the complainant] coming in saying it didn't happen? No matter–and you have a question about how the prosecutor questioned this child and whether or not she was tricked into saying something that she didn't really mean. Ask for it to be read back. Pinpoint it in the record. Say we had a disagreement as to whether or not–what the context of that conversation was, and we would like to hear the context of that conversation in order to make up your mind as to whether or not that child has been treated fairly when she was being questioned.

The State responded to this charge that there was "nothing confusing" about the State's questions to the complainant and that her answers to these questions were consistent with her prior statements to Batchelder, Todd, and Cook.

[STATE]: Now, the question you have to ask yourself is do I believe [the complainant's] testimony in court when she told me that it happened. And the defense can say that I tricked her all they want to, but you have 12 sets of eyes and 12 sets of ears, and you can ask yourself was [the complainant] confused when I asked her, tell me about a time that you do remember. She has a 147 IQ. And I can't speak for you guys, but I know she's a lot smarter than I am. And there is nothing confusing about tell me about a time that you remember. Well, he came into my room. Well, what happened when he came into your room? He did what I told the counselor.

Do you believe [the complainant] here in court when she told you that it happened? Do you believe [the complainant] when she told Valerie Batchelder that her father messes with her? Do you believe [the complainant] when she told Dawn Todd that her father was sexually abusing her? Do you believe [the complainant] when she told Cory Cook it was happening? Do you believe [the complainant] when she told her friend, my dad does things to me at night?

The court of appeals decided, among other things, that the trial court abused its discretion to admit the complainant's out-of-court statements to Todd and Cook under rule 801(e)(1)(B) because

the complainant's "disavowal of her [trial] testimony supporting [appellant's] guilt, taken alone" could not operate "as an implicit charge that she was 'improperly influenced.'" The court of appeals decided:

> We see no caselaw, nor does the State direct us to any, that would justify our stretching rule 801(e)(1)(B) to hold that [the complainant's] disavowal of her testimony supporting [appellant's] guilt, taken alone, operated as an implicit charge that she was "improperly influenced." Similarly, nothing in defense counsel's cross-examination of [the complainant] implied that [the complainant] was lying when she testified that [appellant] had assaulted her or that she had been pressured to so testify. Defense counsel stayed completely away from the testimony that damaged [appellant's] case and emphasized [the complainant's] testimony that was favorable to [appellant]–[the complainant] had lied about the assault and had recanted consistently since soon after the outcry.[15] All the jury had before it was [the complainant's] conflicting testimony. We hold that conflicting evidence alone does not trigger rule 801(e)(1)(B).[16]

*Klein*, 191 S.W.3d at 784.

We granted the State's petition to also review this decision. Ground two of the State's petition for discretionary review states:

> Did the court of appeals err by finding that the trial court abused its discretion by admitting the testimony of a CPS investigator [Todd] and the investigating police officer [Cook] under Evidence Rule 801(e)(1)(B) when the court of appeals itself acknowledged that the testimony of the child victim was internally conflicting?

On this record, we decide that "conflicting evidence alone" was sufficient to "trigger rule 801(e)(1)(B)." The record fairly reflects that this was the only element of rule 801(e)(1)(B) that appellant contested. Having decided that the trial court could have reasonably found that the

---

[15] The evidence, however, supports a finding that the complainant had not "recanted consistently since soon after the outcry." *See* Footnote 7.

[16] The record from the admissibility hearing, however, reflects that the parties may have believed that "conflicting evidence alone" triggered rule 801(e)(1)(B), since this was the only element of rule 801(e)(1)(B) that appeared to be in dispute at the hearing.

complainant's trial testimony was conflicting on whether appellant sexually abused her (thus, making the complainant's out-of-court statements to Todd and Cook "consistent with" at least portions of her trial testimony for purposes of rule 801(e)(1)(B)), it was incumbent upon appellant (as the losing party in the trial court) to alert the trial court to any other element[s] of rule 801(e)(1)(B) that would require exclusion of the complainant's out-of-court statements to Todd and Cook. *See Bolden v. State*, 967 S.W.2d 895, 896-99 (Tex.App.–Fort Worth 1998, pet. ref'd) (defendant preserved claim that state's direct examination of witness to defuse anticipated attempt by defense to impugn witness' motives precluded admission of prior consistent statement to rehabilitate witness after attempted impeachment by the defense, but defendant failed to preserve claim that prior consistent statement was inadmissible because it post-dated the witness' motive to fabricate). Appellant, therefore, failed to preserve any error with respect to any other element of rule 801(e)(1)(B). *See Moran v. State*, 213 S.W.3d 917, 923 (Tex.Cr.App. 2007) (addressing preservation of error for first time on discretionary review); *State v. Dixon*, 206 S.W.3d 587, 590 (Tex.Cr.App. 2006) (op. on orig. subm'n) (discretionary review court may affirm trial court's ruling if it is reasonably supported by the record and is correct on any theory of law applicable to the case).[17]

---

[17]

   Citing to this Court's decision in *Vinson v. State*, 252 S.W.3d 336, 340 (Tex.Cr.App. 2008), Judge Price's concurring and dissenting opinion claims that there was no procedural default by appellant essentially because his objection put the State on notice that it had to establish every element of rule 801(e)(1)(B). Appellant's objection, however, was that the complainant's prior statements to Todd and Cook were inadmissible as prior inconsistent statements for impeachment purposes. Appellant's objection was that the State, knowing that the complainant would deny that appellant molested her, called the complainant to testify solely for the purpose of allowing the State to present her prior statements to Todd and Cook to the jury under the guise of impeachment. *See generally Hughes*, 4 S.W.3d at 5-8 (deciding, under similar circumstances, that trial court abused its discretion to permit State to impeach its witness with prior inconsistent statements).
   Whether the complainant also testified on direct examination that appellant did molest her then became the issue, with the State claiming that she did so testify, making her prior statements

In addition, we would find it difficult to conclude that the trial court abused its discretion to admit the complainant's out-of-court statements under a consideration of the other elements of rule 801(e)(1)(B). The complainant (i.e., the declarant) testified at trial, and she was subject to cross-examination. The trial court could reasonably have found that the complainant testified at trial that appellant sexually abused her and that this testimony was, therefore, consistent with the complainant's out-of-court statements to Todd and Cook that appellant had sexually abused her. The issue, therefore, is whether these prior out-of-court statements to Todd and Cook were "offered to rebut an express or implied charge against [the complainant] of recent fabrication or improper influence or motive."

The record supports a finding that these out-of-court statements were offered to rebut an implied charge of recent fabrication.[18] The complainant testified on cross-examination that appellant

---

to Cook and Todd admissible for impeachment purposes (to impeach her other testimony on direct examination that appellant did not molest her) and as substantive evidence of appellant's guilt under rule 801(e)(1)(B). Appellant's only claim at this point was that the complainant consistently testified on direct examination that appellant did not molest her and this was the principal issue addressed by the parties and the trial court during the hearing on the admissibility of the complainant's prior statements to Cook and Todd. The record fairly reflects that appellant seemed satisfied that the trial court's ruling on this specific issue would resolve the admissibility of the complainant's prior statements to Todd and Cook. On this record, therefore, the State demonstrated that its proffered evidence overcame the only "stated objection" that appellant made. *See Vinson*, 252 S.W.3d at 340 (once an objection is made, the proponent must demonstrate that the proffered evidence overcomes the stated objection). We believe that *Vinson* supports a decision that appellant procedurally defaulted any claim that the complainant's prior statements to Todd and Cook failed to satisfy the other elements of rule 801(e)(1)(B). This is, in large part, the reason that we have decided that, on this record, "conflicting evidence alone" was sufficient to "trigger rule 801(e)(1)(B)."

18 *See State v. Parsons*, 874 A.2d 875, 879 n.7 (Me. 2005) (party who desires to limit the admissibility of a prior consistent statement on the basis that the prior statement is being used only to rebut an express or implied charge of improper influence or motive should take care to clearly limit the express or implied charge to improper influence or motive, and should also not charge, expressly or impliedly, recent fabrication).

did not sexually abuse her and that she lied when she initially accused appellant of sexually abusing her. She also testified on cross-examination that on several occasions she "tried to tell the prosecutors that these allegations were not true." The trial court could reasonably have found that this cross-examination implicitly charged that the complainant's direct-examination testimony that appellant did sexually abuse her was a recent fabrication (made during the trial),[19] which obviously occurred *after* the complainant made the out-of-court statements to Todd and Cook. *See Tome v. United States*, 513 U.S. 150, 156-66 (1995) (generally discussing FED. R. EVID. 801(d)(1)(B), which is identical to Texas Rule 801(e)(1)(B), and specifically holding that the federal rule "permits the introduction of a declarant's consistent out-of-court statements to rebut a charge of recent fabrication or improper influence or motive only when those statements were made before the charged recent fabrication or improper influence or motive"); *Hammons*, 239 S.W.3d at 804 (prior consistent statement must be made prior to the time that the supposed motive to falsify arose).[20] We disagree with the court of appeals that "nothing in defense counsel's cross-examination of [the complainant] implied that [the complainant] was lying when she testified [at trial] that [appellant] had assaulted her." *See Klein*, 191 S.W.3d at 784.[21]

---

[19] *See* Footnote 8.

[20] The holding in *Tome* is consistent with the pre-federal rules of evidence common-law rule "that a prior consistent statement introduced to rebut a charge of recent fabrication or improper influence or motive was admissible if the statement had been made before the alleged fabrication, influence, or motive came into being, but it was inadmissible if made afterwards." *See Tome*, 513 U.S. at 156; *Hammons*, 239 S.W.3d at 804.

[21] The record also supports a finding that the complainant's out-of-court statements to Todd and Cook were admissible to rebut a charge subtly made by appellant during cross-examination and later vociferously made by appellant during closing jury arguments that the complainant's trial testimony on direct examination that appellant sexually abused her was motivated or influenced by the State's

trickery in questioning her. *See Hammons*, 239 S.W.3d at 808 (subtly implied charge of recent fabrication during defendant's cross-examination "became vociferously express during [defendant's] closing argument"); *cf. Bolden*, 967 S.W.2d at 898-99.

Judge Price's concurring and dissenting opinion suggests that the trial court abused its discretion to admit the complainant's prior consistent statements to Todd and Cook because the defense made no charge of recent fabrication until closing jury arguments, when it argued that the State tricked the complainant into testifying on direct examination that appellant molested her. *See* Concurring and dissenting op. at 5 (Price, J., concurring and dissenting). Our decision in *Hammons*, however, makes clear that the trial court is uniquely positioned to make the determination of whether a defendant's cross-examination makes the necessary accusation and that this determination may be informed by many factors, including closing jury arguments. *See Hammons*, 239 S.W.3d at 808-09 ("Thus, we note that a reviewing court, in assessing whether the cross-examination of a witness makes an *implied* charge of recent fabrication or improper motive, should focus on the 'purpose of the impeaching party, the surrounding circumstances, and the interpretation put on them by the trial court.' (Footnote omitted). Courts may also consider clues from the voir dire, opening statements, and closing arguments. From the totality of the questioning, giving deference to the trial judge's assessment of tone, tenor, and demeanor, could a reasonable trial judge conclude that the cross-examiner is mounting a charge of recent fabrication or improper motive?"). On this record, we defer to the trial court's ruling admitting the evidence, particularly since the trial court, being in the best position to assess "tone, tenor, and demeanor," found "an express or implied charge of improper inference [sic] motive" when it admitted the evidence and the defense "vociferously" made such an accusation during its closing arguments. *See id.* (in assessing whether cross-examination of a witness makes an implied charge of recent fabrication, reviewing court should consider, among other things, "the interpretation put on [the cross-examination] by the [trial] court"). It is difficult to imagine that the defense would have "vociferously" made this accusation during its closing jury arguments without any evidentiary support for it already in the record. *See Gallo v. State*, 239 S.W.3d 757, 767 (Tex.Cr.App. 2007), *cert. denied*, 2008 U.S. LEXIS (June 2, 2008) (permissible areas of jury argument are, among other things, summation of and reasonable deduction from the evidence).

We also note that, in cases like this, other courts, applying state evidentiary rules unlike rule 801(e)(1)(B), have upheld the admissibility of a child's out-of-court statements similar to those in this case on the rationale that the child's out-of-court statements may be more reliable than the child's trial testimony, which may "become contaminated by contacts and influences prior to trial" such as a pressure to recant. *See State v. Benwire*, 98 S.W.3d 618, 624 (Mo. App. 2003). The Court in *Benwire* was applying Mo. Rev. Stat. § 491.075, which, unlike Texas Rule 801(e)(1)(B), allows the admission of an out-of-court statement of a child under twelve if the court finds that the "time, content and circumstances of the statement provide adequate indicia of reliability." *See Benwire*, 98 S.W.3d at 624; *see also Lawson v. State*, 865 A.2d 617, 625 (Md. Ct. Spec. App. 2005) (applying a similar statute in a case like this in upholding the sexually abused child's out-of-court statements and also noting that, unlike Texas Rule 801(e)(1)(B), the Maryland statute "does not require that the victim's out-of-court statement to a third party be consistent with the victim's in-court testimony to be admissible" in part because "as a general phenomena, child abuse victims frequently recant their

Judge Cochran's dissenting opinion claims that the complainant's out-of-court statements to Todd and Cook "could not possibly qualify as statements offered to rebut an explicit or implicit charge of recent fabrication" because no charge of recent fabrication "for some improper reason" was made by the defense on cross-examination. Judge Cochran's dissenting opinion describes the application of rule 801(e)(1)(B) in the following terms:

> Rule 801(e)(1)(B) allows a party to rehabilitate a witness who, **on cross-examination**, has been accused–subtly or directly–of recently fabricating or changing his testimony for some improper reason. (Footnote omitted). In essence, the opposing party is accusing the witness of lying and of recently making up that lie. When this occurs, the sponsoring party may rehabilitate the witness by offering out-of-court statements that are consistent with that witness's in-court testimony and that were made before the witness had a motive to change his testimony. The rehabilitation evidence shows that the witness has said the same thing, sung the same tune, both before and after the alleged improper influence or motive arose. Thus, goes the logic, the purported improper influence or motive (such as a bribe, offer of a "deal" to a co-defendant, a pending civil lawsuit, and so forth), did not, in fact, change the witness's testimony. The witness has consistently said the same thing, regardless of any bribe, plea deal, civil lawsuit, etc.

Dissenting op. at 2 (Cochran, J., dissenting) (emphasis supplied).

We have decided that the trial court could reasonably have found that the cross-examination of the complainant by the defense implicitly charged that the complainant's direct-examination testimony that appellant did sexually abuse her was a recent fabrication. It is difficult to imagine what other purpose the defense would have had on cross-examination when it reaffirmed the complainant's recantation.

Judge Cochran's dissenting opinion seems to change the language of the "recent fabrication" element of rule 801(e)(1)(B) to require that a recent fabrication be due to an improper reason, usually an improper influence or motive. This element of rule 801(e)(1)(B), however, does not require that

initial reports of abuse").

the recent fabrication be due to an improper reason. Rule 801(e)(1)(B) permits the admission of a prior consistent statement to rebut a charge of "recent fabrication **or** improper influence or motive." (Emphasis supplied). *See* Footnote 18, citing *Parsons*, 874 A.2d at 879 n.7 (party who desires to limit the admissibility of a prior consistent statement on the basis that the prior statement is being used only to rebut an express or implied charge of improper influence or motive should take care to clearly limit the express or implied charge to improper influence or motive, and should also not charge, expressly or impliedly, recent fabrication). The "recent fabrication" element of rule 801(e)(1)(b) plainly does not require a "charge of recent fabrication for some improper reason." It requires only a "charge of recent fabrication."

Judge Cochran's dissenting opinion also appears to claim that a "charge of recent fabrication or improper influence or motive" must always be made on cross-examination. The State, however, argues that "[a]lthough an allegation of improper influence or motive is most often made during the cross-examination of a witness, the law does not require that the allegation be made in this fashion" and that the "fact that the predicate for admissibility was satisfied in an atypical fashion [primarily by the complainant herself on direct examination] did not justify the Court of Appeals holding that the trial court abused its discretion in admitting the testimony." With citations to the record and to the opinion of the court of appeals omitted, we set out pertinent portions of the State's brief:

> However, it was not the [complainant's] "disavowal" of her [direct-examination] testimony [that appellant sexually abused her] that is important here, but the reason for the disavowal. [The complainant] told the jury that she testified the way she had because she misunderstood what the prosecutor was asking. The implication was that the prosecutor's questions were confusing or tricky and therefore influenced the girl to answer the questions in an untruthful manner. Thus, the jury was told, at least by implication, that if the prosecutor had not asked such confusing or tricky questions, [the complainant] never would have testified that her father sexually assaulted her.
>
> [Appellant's] counsel gave this implication express utterance as the parties discussed

the admissibility of testimony from [Todd and Cook]. Defense counsel stated to the trial court that the prosecutor had attempted to "seduce" the girl's statements, that the prosecutor asked questions that the girl did not understand, that the girl was manipulated through "lawyer questions," and that the prosecutor phrased questions in a way to get a certain answer. Clearly, the defense attorney had no trouble alleging an improper influence to encourage the girl to testify consistently with her outcries.

Moreover, the sound discretion of the trial court's ruling was borne out later when defense counsel argued before the jury that [the complainant] would not have testified the way she did without slick and tricky questioning by the prosecutor. One defense counsel referred to the "skillful" questioning of the prosecutor and how "words can be twisted."

\* \* \*

**Under Rule 801(e)(1)(B), the State was entitled to show the jury that it was not the questions by the prosecutor that caused the girl to testify that she had been sexually assaulted by [appellant] because she had said the same thing to various persons in early 2002 at a time when the prosecutor was not asking questions.**

\* \* \*

In this case [the complainant] testified at trial and was subject to cross-examination. The testimony of [Todd and Cook] was consistent with that portion of [the complainant's] testimony where she stated that her father had sexually assaulted her. The witness and defense attorney alleged implicitly and directly that the child so testified because she was confused and/or tricked by the manner in which the prosecutor questioned her. The prior statement occurred before the allegation of improper influence arose. Thus the predicate was satisfied for admission of the testimony of [Todd and Cook] as consistent statements, and the trial court admitted the testimony on this basis.

(Emphasis supplied).

We agree. The trial court would not have abused its discretion to find that the complainant claimed on direct examination that her testimony that appellant sexually abused her was improperly influenced by the State's trickery in questioning her with this being vociferously repeated by the defense during the admissibility hearing and during closing jury arguments. We agree with the State that the trial court did not abuse its discretion to decide that Rule 801(e)(1)(B) permitted the State to show that the complainant had said the same thing to Todd and Cook without being "seduced" into doing so with "trick" questions from the State. On this record, the trial court's decision admitting the

complainant's out-of-court statements to Todd and Cook was entirely within the bounds of reasonable disagreement. A contrary decision on appeal would be a misapplication of the appellate standard of review so thoroughly described in *Hammons*.

Notwithstanding the foregoing, the record also reflects that on direct examination by the State the complainant acknowledged that she made out-of-court statements to Todd and Cook that appellant had sexually abused her without any objection by appellant or request by appellant for a limiting instruction.

> Q. [STATE]: [Complainant], I'm going to go back over something. Now, you told Ms. Batchelder and you told Dawn Todd with CPS and you told the police that your dad came into your room at night and that he touched you on your vagina with his fingers and that he licked you on your vagina with his tongue. Is that something that happened or something that didn't happen?
>
> A. [COMPLAINANT]: Didn't happen.
>
> &#42; &#42; &#42;
>
> Q. Do you remember what you told Dawn Todd when you went to talk to her?
>
> A. No.
>
> Q. Did you tell her that your dad had done these things or that he had not done these things?
>
> A. Had.
>
> Q. Why did you tell Dawn Todd that?
>
> A. Because I was afraid that if I–because I was afraid.
>
> Q. What were you afraid of?
>
> A. I was afraid if I changed my story, I'd get in trouble for lying.
>
> Q. Is lying something that you get in trouble for?
>
> A. Sometimes.
>
> Q. Lying is not a good thing to do, is it?

A. No.

Q. Why would you think you would get in trouble for changing your story if it wasn't true and you were supposed to tell the truth and you went to Dawn Todd and you said my father is sexually abusing me?  What made you think you would get in trouble for telling the truth?

A. Because I had already told two people, and they might not believe me.  And since I lied and since this was a big thing to lie about, I'd get in trouble.

Q. Who had you told before you talked to Dawn Todd, the CPS worker?

A. Ms. Batchelder.

Q. And who else?  You said two people.

A. (No verbal response.)

* * *

Q. You said that a police officer [Cook] came to your school two times to talk with you.  I want to talk about the first time he came, okay?  Now, that was the next week; is that right?  Does that sound about right?

A. I don't know.

Q. Do you remember what you talked to that police officer about?

A. Yes.

Q. What did you tell him the first time that you talked to him?

A. That my dad had done what I said.

With this evidence coming in without objection or limitation, it became part of the general evidence in the case, and the jury could have used it for any purpose.  *See Hammock v. State*, 46 S.W.3d 889, 893-95 (Tex.Cr.App. 2001) (when evidence is admitted without a limiting instruction, the evidence is admitted for all purposes).  Under these circumstances, any error in admitting the testimony of Todd and Cook about the complainant's out-of-court statements to them was harmless since the substance of this evidence was admitted without limitation or objection during the

complainant's testimony on direct examination by the State. *See Leday v. State*, 983 S.W.2d 713, 718 (Tex.Cr.App. 1998) (overruling an objection to evidence is harmless "when other such evidence was received without objection, either before or after the complained-of ruling"); *see also Byrd v. State*, 187 S.W.3d 436, 444 (Tex.Cr.App. 2005) (addressing, on discretionary review, court of appeals' harm analysis as part of ground for discretionary review that evidence was erroneously admitted under co-conspirator exemption to hearsay rule set out in TEX. R. EVID. 801(e)(2)(E)).

In addition, we do not agree with appellant's suggestion to the trial court at the admissibility hearing that he "could not object" to the complainant's testimony about her out-of-court statements to Todd before the State called Todd to testify.[22]  The complainant's testimony about the substance of her out-of-court statements to Todd was a foreseeable occurrence to which appellant could and should have objected.  *See Young v. State*, 137 S.W.3d 65, 70 (Tex.Cr.App. 2004) ("[i]n most instances, an objection will prevent the occurrence of the prejudicial event, and the failure to make a timely, specific objection prevents appellate review").

The judgment of the court of appeals is reversed, and the case is remanded there for further proceedings consistent with this opinion.

Hervey, J.

Delivered: October 1, 2008
Publish

---

[22]

Appellant claimed that he could not object when the State, during its direct examination of the complainant, "continually referred" to Todd's interview with the complainant.

[DEFENSE]: Now the defense would object to the calling of Dawn Todd, the CPS worker that interviewed [the complainant], and that the prosecutor has continually referred to that interview.  We could not object before now.