COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS





MARIA GUADALUPE DURAN,

                                    Appellant,

v.

THE STATE OF TEXAS,

                                    Appellee. 

§
 
§
 
§
 
§
 
§

§


No. 08-08-00288-CR

Appeal from
 409th District Court

of El Paso County, Texas

(TC # 20030D05977)



 

 

 





O P I N I O N

            Maria Guadalupe Duran was indicted for causing serious bodily injury to a child. A jury
found her guilty and assessed punishment at ten years’ confinement and a fine of $10,000.
Confinement was suspended and Appellant was placed on community supervision for ten years. 
Because the evidence is both legally and factually sufficient to support the conviction, we affirm.
FACTUAL BACKGROUND 
            On November 15, 2003, Officer Matthew Jones responded to a call for a welfare check of
a child. He met with Appellant and Alfonso Dozal III.


 Appellant told the officer she woke her
newborn infant


 around 7 a.m. to feed him. The 9-1-1 call was made around 9 a.m. Appellant’s
demeanor appeared calm, more so than that of a mother with a sick newborn. Officer Jones then
contacted Child Protective Services. 
            When paramedic Aaron Fierro arrived at the apartment, he found an infant wrapped in a
blanket. Fierro unwrapped the child and noticed the baby had shallow respirations, was pale and
cold, had mottled skin from his shoulders to his feet, and had dried blood around the nostrils. The
child was transported by ambulance to the trauma unit of Providence Memorial Hospital. 
            Detective Gabriel De La Hoya responded to Providence Memorial Hospital where he
attempted to talk to Alfonso Dozal IV, the victim’s brother. De La Hoya was then instructed to go
to the Advocacy Center for the Children of El Paso to interview the other siblings. De La Hoya and
Detective Arbogast were only able to locate Natalie Blanco.


 
            Detective Arturo Ruiz transported Appellant to police headquarters to interview her. After
being read her Miranda Rights, Appellant agreed to provide a written statement. She recalled that
the baby had an appointment with pediatrician Dr. Miguel Ibarra on November 14, 2003 and was
given a clean bill of health. On Friday night, she fed the baby around 10:30 p.m. and Dozal changed
his diaper. Appellant put him to bed in his bassinet. Appellant and her husband went to bed between
11 p.m. and midnight. Around 1 a.m., the child awakened and Appellant fed him. Dozal changed
his diaper and Appellant wrapped him in a blanket and put him back to sleep. She also covered him
with two baby blankets because the heater was not turned on in the apartment. By now, it was
1:45 a.m. 
            Appellant woke up around 7 a.m. and found it odd that the baby was still asleep because he
usually woke up between 4 and 5 a.m. She reached over and moved the child a bit, but he did not
respond. She prodded him a little harder and he stretched.Appellant then went into the bathroom for
no longer than two minutes. When she returned, Dozal was folding some blankets. Appellant
picked up the infant and noticed that he was cold to the touch, very pale, and had dried blood around
his nose. The right side of his face and his arm were purple and he was breathing abnormally. 
Dozal first called his mother because they needed her car. Appellant changed the baby’s diaper and
noticed that he was extra wet. She handed the baby to her husband so she could get dressed, but
Dozal told her to call 9-1-1 because the child had stopped breathing. Dozal tapped him on the back
until he started breathing again. Appellant called 9-1-1 and the ambulance arrived within two
minutes. Appellant concluded her statement by explaining that she and her husband provided
constant care for the baby and the other children were not allowed to hold him. 
            Dr. Ibarra testified that he conducted a well-baby exam on November 14 and found no
abnormalities. Appellant’s only complaint about her baby’s health was that he was “gassy.” 
            Jose Escobar, a former CPS worker in El Paso, testified that when he asked Appellant about
the baby’s health, she said his problems may have been caused by medication prescribed by the
hospital or because he was discharged too early. Appellant also mentioned she had a great deal of
financial stress during her pregnancy. She was unable to work and could not pay her bills. Dozal
was not working either. Escobar followed protocol and contacted the police after speaking with
Appellant because he was suspicious of a crime. The next day, he made an unannounced visit to the
apartment. Appellant said she needed to tell him something that she hadn’t told the police. When
asked why she did not tell the police initially, she responded that she was being treated in a
condescending and disrespectful manner. She told Escobar that she had become suspicious that
something may have happened with Ashley


 and the baby. Mother and daughter had had a
conversation several days prior to Escobar’s visit. This led Escobar to believe that Appellant was
pressuring Ashley to say something has happened so that Appellant would not be blamed. Escobar
found no evidence that the baby’s injuries were caused by any of his siblings. As a result of
Escobar’s findings, the children were removed from the home. 
            Chetan Moorthy, a pediatric radiologist at Providence Memorial Hospital, testified he
reviewed the radiologic exams of the victim. A CAT scan was performed on November 17, 2003. 
The scan contained white spots indicating there was bleeding within the baby’s brain. The outside
area of the brain appeared very dark, which according to Dr. Moorthy was abnormal. The skin
surrounding the skull was also swollen. The bone in the back of the baby’s head had been pushed
in by force. This resulted in swelling on the back of the scalp. An MRI examination was conducted
on December 3, 2003.


 The brain had shrunk since the time of the CAT scan as a result of the
damage suffered. Because the brain had atrophied, the space between the brain and the skull filled
with fluid mixed with blood. The MRI showed that the brain was turning to a “hull” and the brain
tissue was lost forever. The brain also showed damage from oxygen deprivation. From these
examinations, Dr. Moorthy was able to determine the cause of the injuries. He concluded that
bleeding occurred at the junction of the outer heavy cortex and the inner lighter white matter
of the brain. The only mechanism that could have caused such tearing was violent
acceleration/deceleration. In other words, it was caused by back and forth shaking. The injury
deprived the brain of oxygen and the baby either suffered a seizure or stopped breathing, or both. 
            Dr. Moorthy also concluded that while a slam of the baby’s head could be responsible for the
injury to the back of the skull, a slam alone could not cause all of the injuries that were suffered by
the child. An average eight- or ten-year-old could not generate the necessary force to cause these
injuries. The brightness of the blood on the CAT scans indicated that the injuries occurred within
24 or 48 hours of the November 17 examination. He opined that the injuries were inflicted, not
accidental. In his opinion, the baby suffered from shaken-baby syndrome. 
            Appellant testified at trial and denied doing anything to injure her baby, including shaking
him. She had asked her daughter Ashley if she had ever seen Natalie pick up the baby. Ashley said
no. Appellant then asked if Ashley had ever picked up the baby. Ashley paused and then responded,
“If I say yes, will I get in trouble?” Appellant then told her, “If you did do anything and picked up
the baby, you need to tell somebody, because they’re looking at us.”
            Natalie testified that Appellant instructed her and her siblings not to pick up the baby because
they might drop him, but Ashley had picked him up because he was crying. Ashley was walking
with him when she heard the toilet flush in the bathroom. She got scared and tried to put Alfonso
back in the cuna


 but as she turned around, the baby hit his head and stopped crying. On cross-examination, Natalie admitted that she had originally testified that Ashley dropped the baby and that
she had told her mother right away. 
            Ashley testified that she picked up the baby against her parents orders. She could not stand
to see her little brother cry so she picked him up when Appellant was in the bathroom. She got
scared when she heard her mother coming and as she turned around, she felt his head first hit her
shoulder and then the metal on the crib. He stopped crying and stared at Ashley like he was lost. 
The State showed the jury the video of the Advocacy Center’s interview with Ashley for the
purposes of showing her size at the time of the incident.
            Dr. Shanker Sundrani, a nerosurgeon and neurologist, testified that he diagnosed the infant
with mental retardation and hydrocephalus on October 19, 2004. Dr. Sundrani placed a shunt on
October 27 to drain fluid off the brain and into the belly. After examining the radiology exams, Dr.
Sundrani concluded that the large amount of blood and swelling indicated trauma from a significant
blow. 
SUFFICIENCY OF THE EVIDENCE
            Appellant brings one issue for review challenging the sufficiency of the evidence to prove
that she caused the child’s serious bodily injuries. 
Standard of Review 
            In assessing the legal sufficiency of the evidence to support a conviction, an appellate court
must consider all of the record evidence in the light most favorable to the verdict, and must
determine whether, based on that evidence and reasonable inferences therefrom, any rational trier
of fact could have found the defendant guilty of all the elements of the offense beyond a reasonable
doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).
Villarreal v. State, 286 S.W.3d 321, 327 (Tex.Crim.App. 2009). This familiar standard gives full
play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the
evidence, and to draw reasonable inferences from basic facts to ultimate facts. Jackson v. Virginia,
443 U.S. at 319, 99 S.Ct. at 2789; Klein v. State, 273 S.W.3d 297, 302 (Tex.Crim.App. 2008). We
consider all of the evidence, whether admissible or inadmissible. Clayton v. State, 235 S.W.3d 772,
778 (Tex.Crim.App. 2007); Wilson v. State, 7 S.W.3d 136, 141 (Tex.Crim.App. 1999). When the
record supports conflicting inferences, we presume that the fact finder resolved the conflicts in favor
of the prosecution and therefore defer to that determination. Clayton, 235 S.W.3d at 778. The same
standard of review is used for both direct evidence and circumstantial evidence cases. Hooper v.
State, 214 S.W.3d 9, 13 (Tex.Crim.App. 2007).
            In reviewing factual sufficiency of the evidence to support a conviction, we are to view all
the evidence in a neutral light, favoring neither party. Johnson v. State, 23 S.W.3d 1, 7
(Tex.Crim.App. 2000); Clewis v. State, 922 S.W.2d 126, 129 (Tex.Crim.App. 1996). In performing
our review, we are to give due deference to the fact finder’s determinations. See Johnson, 23 S.W.3d
at 8-9; Clewis, 922 S.W.2d at 136. There are two ways in which the evidence may be factually
insufficient. The first is that the evidence supporting the verdict, though legally sufficient, is
nonetheless too weak to support it. Lancon v. State, 253 S.W.3d 699, 705 (Tex.Crim.App. 2008);
Goodman v. State, 66 S.W.3d 283, 285 (Tex.Crim.App. 2001). The second is that, when considering
conflicting evidence, the jury’s verdict is against the great weight and preponderance of the evidence. 
Thus, the question we must consider in conducting a factual sufficiency review is whether a neutral
review of all the evidence, both for and against the finding, demonstrates that the proof of guilt is
so obviously weak as to undermine confidence in the fact finder’s determination, or the proof of
guilt, although adequate if taken alone, is greatly outweighed by contrary proof. See Johnson, 23
S.W.3d at 11.
            Under the first part of this standard, we cannot conclude that a conviction is “clearly wrong”
or “manifestly unjust” simply because, on the quantum of evidence admitted, we would have voted
to acquit had we been on the jury. Watson v. State, 204 S.W.3d 404, 417 (Tex.Crim.App. 2006). 
Under the second part, we cannot declare that a conflict in the evidence justifies a new trial simply
because we disagree with the jury’s resolution of that conflict. Id. Before finding that the evidence
is factually insufficient to support a verdict under the second part of the standard, we must be able
to say, with some objective basis in the record, that the great weight and preponderance of the
evidence contradicts the jury’s verdict. Id.
            The existence of alternative reasonable hypotheses may be relevant to the factual sufficiency
review but they are not determinative. Wilson, 7 S.W.3d at 141. When a defendant identifies an
alternative reasonable hypothesis raised by the evidence, the standard of review remains the same. 
Richardson v. State, 973 S.W.2d 384, 387 (Tex.App.--Dallas 1998, no pet). 
Serious Bodily Injury to a Child
            A person commits the offense of injury to a child if she intentionally or knowingly, either
by act or omission, causes serious bodily injury to a child who is fourteen years of age or younger.
See Tex.Pen.Code Ann. § 22.04(a)(1) & (c)(1)(Vernon Supp. 2009). “Serious bodily injury” means
bodily injury that creates a substantial risk of death or that causes death, serious permanent
disfigurement, or protracted loss or impairment of the function of any bodily member or organ. 
Tex.Pen.Code Ann. § 1.07(a)(46)(Vernon Supp. 2009).
            The testimony of Dr. Moorthy and Dr. Sundrani established that the infant suffered serious
bodily injury, so much so that he was diagnosed with mental retardation and hydrocephalus. Some
of his brain tissue was “lost forever.” Such a catastrophic brain injury may have caused him to have
a seizure or stop breathing. As a result, the victim suffered from protracted impairment of the
function of his brain. This evidence is not contested by Appellant; instead she argues that the
evidence was insufficient to prove that she committed the offense. 
            Appellant and her husband were the only adults with the child prior to the 9-1-1 call. In her
statement, Appellant admitted that she “moved” the child once, and then when he did not respond,
she “moved him a little harder.” She also said that she “tapped” the child, but he did not respond,
so she “tapped him a little bit harder.” The jury was free to interpret Appellant’s characterization
as an attempt to minimize her actions toward the child. 
            Appellant also exhibited behavior that provided circumstantial evidence of guilt.
Circumstantial evidence is as probative as direct evidence in establishing guilt and even standing
alone can be sufficient. Hooper v. State, 214 S.W.3d 9 (Tex.Crim.App. 2007), citing Guevara v.
State, 152 S.W.3d 45, 49 (Tex.Crim.App. 2004). For example, Appellant told CPS investigator
Escobar that Ashley may have been responsible. But Escobar testified that he believed Appellant
was pressuring Ashley to say something had happened to deflect blame. Escobar found nothing to
indicate that the injuries were caused by one of the siblings. Natalie Blanco also gave differing
accounts to investigators. When she first told the story, she said that Ashley “dropped” the baby. 
Later she changed her story so that Ashley hit the baby’s head on the crib. The jury heard this
evidence as well as Dr. Moorthy’s opinion that falling on the floor or hitting a bed rail would have
caused a different kind of injury. Dr. Moorthy also opined that an average eight- to ten year old child
could not generate the amount of force necessary to cause these injuries which he characterized as
inflicted rather than accidental. Of course, the jury was free to resolve this conflict in the testimony
against Appellant. They may have interpreted Appellant’s attempt to blame her daughter as
consciousness of guilt. Consciousness of guilt may be one of the strongest indicators of guilt. Lee
v. State, 866 S.W.2d 298, 302 (Tex.App.--Fort Worth 1993, pet. ref’d); Torres v. State, 794 S.W.2d
596, 598 (Tex.App.--Austin 1990, no pet.).
            Having viewed the evidence in a light most favorable to the verdict, we must conclude that
the evidence could have led the jury to find Appellant guilty of causing serious bodily injury to her
son. The jury was free to weigh any conflict in the testimony. We overrule Appellant’s legal
insufficiency claim. And having viewed the evidence in a neutral light, we similarly find that the
evidence was factually sufficient. We overrule sole point and affirm the judgment of the trial court.


June 30, 2010                                                                                                                                                  ANN CRAWFORD McCLURE, Justice

Before Chew, C.J., McClure, J., and Bramblett, Judge
Bramblett, Judge, sitting by assignment

(Do Not Publish)