

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-12-00173-CR

CLEVIN EARL BROWN, JR.                                             APPELLANT

V.

THE STATE OF TEXAS                                                 STATE

----------

### FROM THE 432ND DISTRICT COURT OF TARRANT COUNTY
### TRIAL COURT NO. 1273133R

----------

## MEMORANDUM OPINION[1]

----------

In two issues, Clevin Earl Brown, Jr. contends that his convictions and sentences for murder and engaging in organized criminal activity (EOCA) should be reversed for jury charge error and the trial court's admission of testimony regarding an allegedly improperly suggestive live lineup. We affirm.

---

[1]*See* Tex. R. App. P. 47.4. This case was originally submitted on May 14, 2013. On June 10, 2014, the court, on its own motion, ordered the appeal to be resubmitted on July 1, 2014; assigned this case to a new panel; and assigned the undersigned to author the opinion.

## Background

Appellant shot Jarami Thomas in a convenience store parking lot in Arlington during a fight. At appellant's trial for murder and EOCA, he claimed that he shot Jarami in self-defense. A jury convicted him of both offenses, rejecting his self-defense claim. In accordance with the jury's assessment, the trial judge sentenced appellant to fifty years' confinement on the murder charge and five years' confinement on the EOCA charge.

## Jury Charge

In his first issue, appellant contends that the trial court reversibly erred by including an improper definition of "knowingly" in the abstract paragraph of the jury charge. Although the State concedes that the incorrect definition was used in the abstract paragraph, it contends that the error is not reversible because it did not egregiously harm appellant.

### Standard of Review

"[A]ll alleged jury-charge error must be considered on appellate review regardless of preservation in the trial court." *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). In our review of a jury charge, we first determine whether error occurred; if error did not occur, our analysis ends. *Id.* If error occurred, whether it was preserved determines the degree of harm required for reversal. *Id.* Unpreserved charge error warrants reversal only when the error resulted in egregious harm. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g); *see* Tex. Code Crim. Proc. Ann. art. 36.19 (West

2

2006). The appropriate inquiry for egregious harm is a fact specific one that must be performed on a case-by-case basis. *Gelinas v. State*, 398 S.W.3d 703, 710 (Tex. Crim. App. 2013); *Taylor v. State*, 332 S.W.3d 483, 489 (Tex. Crim. App. 2011).

In making an egregious harm determination, "the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 171; *see generally Gelinas*, 398 S.W.3d at 708–10 (applying *Almanza*). Errors that result in egregious harm are those "that affect the very basis of the case, deprive the defendant of a valuable right, vitally affect the defensive theory, or make a case for conviction clearly and significantly more persuasive." *Taylor*, 332 S.W.3d at 490 (citing *Almanza*, 686 S.W.2d at 172). The purpose of this review is to illuminate the actual, not just theoretical, harm to the accused. *Almanza*, 686 S.W.2d at 174.

**Applicable Law**

As charged in this case, a person commits murder if he intentionally or knowingly causes the death of a person or if he intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of a person. Tex. Penal Code Ann. § 19.02(b)(1)–(2) (West 2011). The penal code provides two definitions of knowingly:

3

A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

*Id.* § 6.03(b) (West 2011). Murder is a result-of-conduct offense, meaning that the actor's conduct must be done with the required culpability to effect the result of death. *E.g., Cook v. State*, 884 S.W.2d 485, 490 (Tex. Crim. App. 1994). Thus, a charge that defines the mental state of "knowingly" as related to the nature of the conduct—i.e., that includes the first definition—as well as the result of the conduct is improper. *Id.*

**The Charge Itself**

Although we have reviewed and considered the charge as a whole, only the pertinent parts are quoted below. The incorrect definition is italicized:

A person commits an offense if, with the intent to establish, maintain, or participate as a member of a criminal street gang, he commits the offense of murder.

A person commits the offense of murder if he intentionally or knowingly causes the death of an individual.

A person commits the offense of murder if he intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual.

. . . .

*A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist.* A person acts knowingly, or with knowledge,

4

with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

. . . .

[Count one application] . . . [I]f you find from the evidence beyond a reasonable doubt that the Defendant . . . did with the intent to establish, maintain or participate as a member of a criminal street gang, commit murder by intentionally or knowingly causing the death of Jarami Thomas . . . , by shooting him with a firearm[,] or if you find that the said defendant . . . did then and there, with the intent to establish, maintain or participate as a member of a criminal street gang, commit murder by intentionally, with the intent to cause serious bodily injury to Jarami Thomas, committing an act clearly dangerous to human life, namely, shooting him with a firearm, which caused the death of Jarami Thomas, then you will find the Defendant . . . guilty of the offense of engaging in organized criminal activity, as charged in Count One of the indictment.

. . . .

[Count two application] . . . [I]f you find from the evidence . . . that the Defendant . . . did then and there intentionally or knowingly cause the death of an individual, Jarami Thomas, by shooting him with a firearm[,] or if you find that the said defendant . . . did then and there intentionally, with the intent to cause serious bodily injury to Jarami Thomas, commit an act clearly dangerous to human life, namely, shooting him with a firearm, which caused the death of Jarami Thomas, then you will find the Defendant . . . guilty of the offense of murder, as charged in Count Two of the indictment.

. . . .

[Self-defense instruction] Upon the law of self-defense, you are instructed that a person is justified in using force against another when and to the degree he reasonably believes the force is immediately necessary to protect himself against the other person's use or attempted use of unlawful force.

The actor's belief that the force was immediately necessary is presumed to be reasonable if the actor:

5

(1) knew or had reason to believe that the person against whom the force was used was committing or attempting to commit murder;

(2) did not provoke the person against whom the force was used; and

(3) was not otherwise engaged in criminal activity.

The use of force against another is not justified:

(1) in response to verbal provocation alone[;]

(2) if the actor provoked the other's use or attempted use of unlawful force[;] or

(3) if the actor sought an explanation from or discussion with the other person concerning the actor's differences with the other person while the actor was unlawfully carrying a weapon.

A person is justified in using deadly force against another:

(1) if he would be justified in using force against the other in the first place, as set out above; and

(2) when and to the degree he reasonably believes the deadly force is immediately necessary to protect himself against the other person's use or attempted use of unlawful deadly force.

By the term "reasonable belief" as herein used is meant a belief that would be held by an ordinary and prudent person in the same circumstances as the defendant.

By the term "deadly force" is meant force that is intended or known by the person using it to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury.

When a person is attacked with unlawful deadly force, or he reasonably believes he is under attack or attempted attack with unlawful deadly force, and there is created in the mind of such person a reasonable expectation or fear of death or serious bodily injury, then the law excuses or justifies such person in resorting to deadly force by any means at his command to the degree that he

6

reasonably believes immediately necessary, viewed from his standpoint at that time, to protect himself from such attack or attempted attack. And it is not necessary that there be an actual attack or attempted attack, as a person has a right to defend his life and person from apparent danger as fully and to the same extent as he would had the danger been real, provided that he acted upon a reasonable apprehension of danger, as it appeared to him from his standpoint at the time, and that he reasonably believed such deadly force was immediately necessary to protect himself against the other person's use or attempted use of unlawful deadly force.

. . . .

Now, if you find from the evidence beyond a reasonable doubt that on the occasion in question, the Defendant . . . committed the offense of murder, but you further find from the evidence, or have a reasonable doubt thereof, that the [D]efendant reasonably believed, as viewed from his standpoint at the time, that from the words or conduct, or both, of Jarami Thomas, it reasonably appeared to the [D]efendant that his life or person was in danger and there was created in the [D]efendant's mind a reasonable expectation of fear of death or serious bodily injury from the immediate use of unlawful deadly force at the hands of Jarami Thomas to himself, and that acting under such apprehension and reasonably believing that the use of deadly force on his part was immediately necessary to protect himself against Jarami Thomas' use or attempted use of unlawful deadly force, he shot Jarami Thomas with a firearm, then you should acquit the [D]efendant on the grounds of self-defense, or if you have a reasonable doubt as to whether or not the [D]efendant was acting in self-defense on said occasion and under the circumstances, then you should give the [D]efendant the benefit of that doubt and say by your verdict Not Guilty.

[Emphasis added.]

In assessing harm resulting from the inclusion of improper conduct elements in the definitions of culpable mental states, we "may consider the degree, if any, to which the culpable mental states were limited by the application portions of the jury charge." *Patrick v. State*, 906 S.W.2d 481, 492 (Tex. Crim.

7

App. 1995), *cert. denied*, 517 U.S. 1106 (1996). In *Patrick*, the court of criminal appeals held that the improper inclusion of an incorrect definition of knowingly was harmless:

> Although the definitions of "intentionally" and "knowingly" indiscriminately set forth the three alternative conduct elements, when those terms are viewed in their factual context, it becomes apparent which conduct element applies to which element of the offense. For instance, the application paragraph states that appellant "did intentionally cause the death of [the victim.]" The term intentionally directly modifies the phrase "cause the death". Referring back to the definitions of culpable mental states, it is obvious that the "result of conduct" and cause the result language are the applicable portions of the full code definitions. We conclude that because the facts, as applied to the law in the application paragraph, pointed the jury to the appropriate portion of the definitions, no harm resulted from the court's failure to limit the definitions of culpable mental states to proving the conduct element of the underlying offense.

*Id.* at 493 (citations omitted).

Appellant contends that the error here could not be harmless because under the charge as given the jury could not have given effect to his claim of self defense and would have been compelled to find that he was guilty—even under his version of the facts—"for simply possessing and displaying the gun." It is true that the application paragraph of the charge here is not as narrow as that in *Patrick*, which required the jury to find that the appellant had engaged in the alleged conduct with the specific intent to kill. *Id.* Thus, we will review the remainder of the factors mentioned in *Almanza*, as well as any other relevant matters, to determine if egregious harm occurred.

8

**The Evidence**

Jarami owed a man named Tre money for losing a Superbowl bet. Tre and appellant were members of the same gang. While Jarami was performing at a club called Dreamworld on the night of March 13, 2011, Tre was in the audience, raising his fists above his head indicating that he wanted to fight Jarami. The host of the event at Dreamworld sent Jarami and his party out of the club through an alternate door because he was afraid they would have a confrontation with Tre at the club.

After the show, Jarami began receiving repeated text messages and phone calls from Tre, possibly as many as thirty "back to back." Jarami's girlfriend Jasmine heard "violent" shouting on the other end of the line when Jarami answered a call. The person calling was Tre. Jarami ignored the calls at first, but eventually "[h]e just wanted to solve everything." He told Jasmine, "Those guys keep calling me about their money, and they're not getting it." Jarami finally agreed to meet Tre at a nearby 7-Eleven so they could settle the dispute with a fight.

When Jarami, Jasmine, and Jarami's cousin Krys and friend Kevyn arrived at the 7-Eleven parking lot, a car full of people was already parked there in a darkened area. Kevyn, who was driving, backed into a spot. Jarami was in the passenger seat, and Jasmine was seated behind Kevyn.[2] Krys got out of the

---

[2]Krys testified that Jasmine drove and parked the car.

9

car, and Kevyn told Jasmine to switch places with him "in case something happened."[3]

According to Krys, a "light-skinned guy" in the other car motioned for them to come over, but Jarami told him, "Y'all want to fight, y'all come over to where the light is." Jasmine and Krys testified that the driver of the other car drove over "really fast" in front of their car and stopped, blocking them in. They both testified that appellant got out of the other car and tried to pull Jarami out from the passenger side. Jasmine tried to pull him back in from the driver's seat.

Jarami and appellant began fighting; some "other guys" came out of the other car, and Kevyn and Krys got out of Jarami's car, to join the fight as well. Tre was among them. Krys tried to pull appellant off Jarami. Krys hit appellant, and appellant pulled out a gun and aimed it at Krys. Krys grabbed appellant's wrist, and they wrestled with the gun back and forth. According to Krys, Jarami came behind appellant and grabbed his wrist and was wrestling with the gun too.

Meanwhile, Tre had retrieved a wooden board; he hit Krys with it while Krys, Jarami, and appellant were wrestling for the gun. Jasmine testified that she saw Tre keep trying to hit Jarami in the back of the head with it while Jarami was fighting appellant. At that point, Jasmine came out of Jarami's car and pulled Tre down. As she was doing so, she looked back at Jarami; she saw appellant pull out a gun, aim it, and shoot Jarami as he was pulling away from him. Jarami

---

[3]Krys also testified that at some point before the fight, all four of them exited the car, and Jasmine bought candy.

10

appeared to be trying to shield himself from the coming shot. Krys testified that as he was trying to get back up after Tre hit him, he saw appellant and Jarami fall. As appellant was standing up and Jarami was on the ground, "the gun [went] off."[4] Appellant had his back to Krys. After appellant shot Jarami, Krys saw appellant walking toward Jarami with the gun out, but a girl who had been in the car with Tre and appellant came over and pulled appellant away. Appellant, Tre, and all those who had been in the car with them fled.

According to appellant, while Jarami was performing at Dreamworld, he pointed out Tre from the stage, as if saying he wanted to fight Tre. After Jarami finished performing, Krys sought out appellant and told him Jarami was waiting out back to fight Tre. Tre did not want to fight and neither did appellant.

Appellant testified that when he and his friends, including Tre, got to the 7-Eleven, they waited in the parking lot until they got a call that Jarami and his friends were there. Appellant's friend DJ, who was driving, drove over to Jarami's car. Appellant got out and told Jarami the fight should just be between Jarami and Tre. Appellant said Jarami and Jasmine grabbed him by his hoodie and tried to pull him into the car; Jasmine's fingernail poked his eye. Krys came over and attacked appellant from the front and Jarami grabbed him by the neck. According to appellant:

_____

[4]Krys testified that he was unsure whether appellant meant to shoot Jarami: "Now, whether he did it on purpose or not, I really don't care, but it happened. But it shouldn't have happened. There shouldn't been a gun there."

11

And then like I'm losing air. I'm like -- you know, I'm paranoid. I'm losing -- I'm losing air. I can't breathe. He's choking me. Krys . . . fighting me from the front. He's trying to grab me like fight me, too. So I grab for the gun. Krys . . . grab my hand, so we fighting over it. He coming to my face. It's going everywhere. It's in the sky right now. J.T. still holding me.

When I -- right when I pulled the gun down, I get it -- I get it from Krys . . . . I come out of J.T. arms. Like he's the one --

. . . .

. . . I just pull the trigger. I'm thinking in my head like I'm fixing to lose my life. I pull this gun. I'm trying to get away from them. I'm trying to get them off me. But I'm like fearing for my life.

So once I -- once I got the gun, pull the trigger like to get him away from me. When I'm falling, I fall off the curb. And hit -- like it hit him, I'm just sitting there like shocked, like just standing there. Like, just -- I'm looking like, Oh, my God. Like he just fell. I didn't -- I didn't mean to shoot the dude or nothing.

The medical examiner who testified about appellant's wounds said that he was shot in the left arm, and the bullet passed through his rib cage, both lungs, and his trachea.

**Arguments of Counsel**

During the State's brief opening statement, the prosecutor told the jury that the gang "one for all, all for one" mentality is the reason appellant killed Jarami and that he did so to "exact[] payment from Jarami for disrespect to the gang." She stated, "[W]hile Jarami sat in his car, [appellant] . . . got out of a vehicle, approached Jarami as he sat in his car and punched Jarami, pulled Jarami out of the car, pulled out a gun, and as Jarami tried to defend himself, shot and killed Jarami." In his opening statement, appellant's counsel emphasized that Jarami

12

and Krys were the aggressors against appellant and that appellant was trying to fight them off. He also said that appellant grabbed his gun when he began to fear for his life and that it went off as appellant was losing his balance.

During the first part of the State's closing argument, the prosecutor described the difference between (1) intentionally or knowingly causing someone's death by shooting him with a firearm and (2) committing an act clearly dangerous to human life with the intent to cause serious bodily injury as "the difference between saying, I did it -- I'm saying I did it on purpose or saying I didn't really mean to kill him when you shot him in the chest. I meant to hurt him really bad." Thus, he described intentionally or knowingly causing death as result-oriented, i.e., meaning to kill.

Additionally, the prosecutor emphasized why the evidence did not show self-defense: because appellant and Tre initiated the fight[5]; because while appellant was with Tre, Tre had been threatening Jarami during the evening before the fight and had sent text messages to others that night indicating that he was going to kill Jarami; and because appellant had knowingly or recklessly

---

[5]Specifically, he argued,

You don't get to claim self-defense if you went -- if you provoked the difficulty, and in doing so -- that means you picked the fight, but your intent was to goad that person into attacking you so that you can then use -- use it as a pretext for killing them.

The whole idea -- you've probably seen this in . . . cowboy movies. You know, the gun fighter's standing there like this saying, Go ahead and draw.

carried a gun, thus committing the offense of unlawfully carrying a weapon. He further argued that Jarami was not using deadly force that would have justified the shooting.

The following excerpt shows the State's emphasis on the evidence showing that appellant intended to kill Jarami and that he shot Jarami knowing it would bring about his death:

> What else is a contested issue? Was it an accident? . . . Well, let's see, he associates with Tre all the time. He was with Tre all evening long. They had visited -- they'd been to Dreamworld earlier in the night.

> And I don't know what made him change his shirt. I don't know what made him change out of the plaid shirt he was wearing at the club and put on a dark hoodie and put the hood over his head before this incident occurred. Maybe you guys can think of a good reason for that.

> Tre threatened J.T. directly, both in telephone and in text messages. We have those in evidence before you. And he was -- remember he was in -- he was with Tre all evening long while this is going on, including while they're riding in the car.

> While his -- while the telephone calls are going on between J.T. and Tre, he's in the car knowing this is going on, and Tre had been proclaiming his intent to kill J.T. to others.

> Tre stated his intent to kill J.T. immediately before the killing. Remember that text messages -- that text message? Immediately, minutes before the killing, he stated his intent to kill him. This is while he was arranging the fight, the, quote, fight.

> The fight. We're just going to fight it out straight up. He's texting at that very moment to somebody else that he's going to kill him, and this is the man sitting next to him in the car. His friend with a gun.

14

He bragged -- Tre bragged in a text message about the killing immediately after. Immediately before, I'm going to kill him; immediately after, I left him dead on the curb.

. . . .

This evidence that this was not an accident. Let's see, he sat in the car with Tre while Tre attempted to lure J.T. to the back of the 7-Eleven, to the darkness. He jumped out first after D.J. blocked in J.T.'s car. He's the first one out of the car.

He approached J.T. while J.T. was still seated in the car. They didn't pull up side by side, window to window, talk out here in the open, out here where nothing bad can happen. We're going to do this? What?

. . . . He jumped out of the car, and he walked -- ran -- ran up and opened the car door. He demanded that J.T. get out and fight, and he was armed at the time.

Think it was an accident? He opened the door and dragged J.T. from the car and was preparing to fire again after shooting J.T. through both lungs and the trachea with a .45 caliber handgun.

And how do we know that's telling the truth? How do you know that was truthful? Well, Jasmine and Krys both accurately described Teka. . . . I -- I don't even know if she remembers getting out of the car. She was probably as frightened as the rest of them.

But I do know one thing. They heard her say, C.J.B., no. This is her friend, her play brother. Do you think under these circumstances she's going to do something to stop it, to get him back in, before he blows that poor boy's head off because she can see he's about to do it?

The defense also discussed the accident versus intent theory:

The murder section. He did not -- and they have a problem with intent. He did not intend to kill J.T. He just didn't.

. . . .

15

. . . But what happens is as they're fighting for it, as he's trying to get away from J.T., he eventually does; and as he does, he tells you he's falling off of that curb where the spent shell casing just happens to be, and as it's coming down, bam, that's where the shot is.

And let me ask you this: If you're trying to murder someone, do you shoot them in the shoulder? Is that -- is that the kill shot that you go for, the shoulder? How many vital organs do you have in your shoulder? That's what they want you to believe. Oh, yeah, he is just a cold-blooded killer because, let me tell you, we see it every day, cold-blooded killers shoot people in the shoulder. . . .

. . . .

. . . [B]ut that grip kept getting tighter and tighter to the point where he could not breathe any longer, he did what any of us would have done. He reached for the closest thing that he had, and that was a gun.

He didn't just start blasting because if he would have, Krys Triggs wouldn't be here. What he did was he grabbed it. And they could see it, and they fought for it. And it wasn't until he started to fall back and they're fighting for it, Krys Triggs tell you they all fell to the ground, but that gun went off.

The State also emphasized in its rebuttal argument that appellant and Tre orchestrated the fight because they planned all along to kill Jarami.

**Voir Dire**

During voir dire, the State described the mental state attributable to the murder count as follows:

And in a case of the elements, we have intentionally up there, and just so you know, *intentionally just means on purpose.*

I know a lot of us watch Law & Order. How many of y'all watch Law & Order? A lot of times you hear them talk about premeditation. Have y'all heard of premeditation?

16

Where in Texas, we don't have premeditation. I don't have to prove that the Defendant sat down and planned the murder. We don't have to prove . . . premeditation. I do have to prove that it was intentional or that it was knowing. [Emphasis added.]

Additionally, when discussing the possibility of assessing probation, at least two prospective jurors seemed to understand that murder is result-oriented conduct and voiced that opinion before the panel:

PROSPECTIVE JUROR: If it was just the organized crime piece, not at all. I can see probation there fairly enough. But if the murder piece, again, if the intention factor is proven or agreed to amongst the jurors, I couldn't see giving probation for that.

. . . .

PROSPECTIVE JUROR: I feel basically the same as everybody else. I don't think you can really go with probation if it was beyond a shadow of a doubt this man intended to kill somebody else.

**Analysis**

After a review of the entire record, including the parts emphasized by *Almanza*, we conclude and hold that the improper definition in the abstract paragraph did not result in egregious harm to appellant.

It is clear that from voir dire through closing argument, the State's theory articulated to the jury was that appellant and Tre planned to kill Jarami in retaliation for failing to pay his gambling debt and that the fight was merely a pretext for the killing. Jasmine, Krys, and a bystander all testified that appellant had been the one to initially approach Jarami's car after the car he was in blocked their car. The defense's theory articulated to the jury was that appellant

17

intended only to facilitate a fight between Jarami and Tre, just happened to have a gun with him, and either shot Jarami by accident or only when the fight got out of hand and he feared for his life. The state of the evidence and jury arguments clarified any error that occurred in the charge: it was clear that the jury was to convict appellant if it believed he and Tre lured Jarami to the parking lot with the intent to shoot and kill him and that it was to acquit appellant of the murder charge if it believed appellant shot Jarami in self defense or that the gun accidentally went off during the fight. We have not found any place in the record where it was suggested to the jury that it could find appellant guilty simply for displaying and possessing the gun during an incident in which a person was killed.

Accordingly, we overrule appellant's first issue.

## Complaint About Live Lineup

In his second issue, appellant alleges that the trial court abused its discretion by overruling his objection to a detective's testimony that Jasmine identified him in a live lineup after previously being unable to identify him in a photo spread.

Jasmine had previously testified that she had identified Tre in a photo spread shown to her by a detective. She thought she had recognized appellant in a different photo spread, but she could not be sure so she told the detective, "He may be the guy, but on the paper it looked different from in person." She then testified that she had identified appellant in a later live lineup. During later

18

questioning of the detective who showed Jasmine the photo spread, appellant's counsel went into more detail about the method the detective used. When the detective said that appellant was the only person common to both the photo spread and lineup, appellant's counsel objected that the live lineup was impermissibly suggestive. He did not ask for the jury to be instructed not to consider any prior evidence regarding the lineup. The trial court overruled the objection, finding both that it was untimely and that the lineup was not unduly suggestive.

Although the State contends that appellant's complaint was not preserved, his counsel had not had the opportunity to question the detective about appellant's being the only similarity between the photo spread and the live lineup until the detective's cross-examination. However, by that point Jasmine had already testified that she identified appellant in the live lineup; thus, regardless of the timeliness of appellant's objection, any error is harmless because the same evidence was previously admitted without objection. *See, e.g.*, *Klein v. State*, 273 S.W.3d 297, 318 (Tex. Crim. App. 2008); *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998) (noting that prior admission of improper evidence renders subsequent, objected-to admission harmless).

Moreover, appellant did not meet the "difficult and heavy burden" required to show by clear and convincing evidence that the live lineup was impermissibly suggestive, especially given that Jasmine and Krys had both testified that they had seen appellant in both Dreamworld and the 7-Eleven parking lot that night in

19

close proximity. *See, e.g.*, *Jackson v. State*, 628 S.W.2d 446, 448–49 (Tex. Crim. App. [Panel Op.] 1982).

We overrule appellant's second issue.

## Conclusion

Having overruled appellant's two issues, we affirm the trial court's judgment.

/s/ Terrie Livingston

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; WALKER, J.; and WILLIAM BRIGHAM (Senior Justice, Retired, Sitting by Assignment).

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  September 4, 2014