**Affirmed and Memorandum Opinion filed September 25, 2014.**



In The

# Fourteenth Court of Appeals

NO. 14-13-00267-CR

**JOHNATHAN LEEDEL WILLIS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 212th District Court**
**Galveston County, Texas**
**Trial Court Cause No. 12CR0719**

## M E M O R A N D U M   O P I N I O N

Appellant Johnathan Leedel Willis challenges his conviction for aggravated sexual assault. Appellant raises three issues on appeal. Appellant contends that (1) the evidence presented at trial was legally insufficient to support his conviction; (2) the trial court erroneously denied his request to impeach the complainant with her prior criminal conviction; and (3) the trial court improperly admitted testimony under the excited utterance exception to the rule against hearsay.

We hold that the evidence was legally sufficient to support appellant's conviction for aggravated sexual assault, appellant has not shown that the trial court abused its discretion by precluding questioning about the prior conviction, and appellant has not shown that he was harmed by the admission of hearsay testimony. We affirm the judgment of the trial court.

## BACKGROUND

Appellant was charged with and convicted of aggravated sexual assault under section 22.021 of the Texas Penal Code. Because appellant challenges the sufficiency of the evidence to support his conviction as well as certain evidentiary rulings, we recount the evidence in some detail.

According to the complainant, on the night of May 16, 2010, she had a fight with her then-boyfriend, Jeremy Daniels, that resulted in Daniels throwing her phone and her losing its battery.[1] The complainant walked to a nearby store but was unable to use the store's phone as she had hoped. The complainant then saw appellant, whom she had met once before, and accepted a ride. Although they drove directly past the home of her best friend's mother, Connie French, the complainant explained she did not want to wake French so she agreed to go to appellant's apartment in order to use his telephone. Appellant directed complainant to his bedroom, where he claimed she would find his phone. The complainant was unable to find his phone in the bedroom. Appellant, holding his phone, then joined the complainant in his bedroom and told her that she could use the phone after she sat with him for ten minutes.

---

[1] Daniels's testimony at trial corroborated the complainant's story regarding his throwing her phone. Daniels also testified, over appellant's hearsay objection, that the complainant called him the next day and told him she had been raped and that it was his fault because he broke her phone.

The complainant testified that she felt uncomfortable and started to leave the room, intending to leave appellant's apartment completely. Appellant shut the bedroom door before she could exit, however, and secured it with a wooden stick. Appellant told the complainant that she was not going anywhere. The complainant pulled out her pocketknife, and she and Appellant began to "tussle" over it. During this struggle, appellant "slung" the complainant onto his bed and wrested control of the knife from her. Once appellant had control of the knife, he held it to the complainant's neck, choked her, and told her to get undressed. Appellant repeatedly threatened to kill both the complainant and himself if she did not do as he said.

The complainant testified that appellant began having sexual intercourse with her once she undressed, even though the complainant kept telling him to stop. Appellant put his hand over the complainant's mouth when she began screaming. Appellant twice forced the complainant to have intercourse with him in this manner. Appellant then refused to let the complainant leave, telling her he would allow her to leave in the morning if she lay down with him in the meantime. The complainant testified that she thought it was around 4:00 a.m. at this point.

According to the complainant, she asked at some point to use the restroom, intending to determine whether there was a window from which she could escape. The complainant remembered being unable to escape from the bathroom, although she offered inconsistent reasons for her inability to do so.[2] The complainant also claimed she attempted to escape from appellant's bedroom window when he later left the bedroom, but he returned and interrupted her attempt. Appellant put the knife to the complainant's neck again and warned her that she had "one more

---

[2] At different points during her testimony, the complainant suggested that the bathroom did not have a window, and that there was a window but it was sealed shut. Other witnesses later testified that the bathroom does not have a window.

time." Appellant told her the same thing several times that morning when she made noises in an effort to attract help, and the complainant interpreted his statement to mean that he would kill her if she said anything else.

The complainant testified that appellant eventually forced her to get into his closet while he left his bedroom to see who was in the other room.[3] She contended she was only in the closet for two to three minutes, however, and was not all the way in the closet, but near the front. The door of the closet was not closed, and from the closet the complainant could see both that the front door was open and that there were people in the other room. When appellant returned to the bedroom, he began doing something at his desk with his back turned to the complainant. The complainant ran out of the bedroom and out the front door of the apartment.

Appellant's cousin, James Jones, also testified at trial. Jones testified that he visited the apartment the same morning the complainant claimed she was held against her will and escaped—May 17, 2010. Initially, Jones could not find appellant in the apartment and noted that his bedroom door was locked. After Jones knocked on the bedroom door, appellant came out of his room, closing the door behind him,[4] and the two chatted for approximately forty-five minutes. Appellant was living in the apartment with his aunt, who had Alzheimer's disease. Jones had offered to pay all of the bills and allowed appellant to live there so that his mother could have 24-hour care.

---

[3] Neither the report of the police officer who took the complainant's statement nor the report of the nurse who examined her reference the complainant hiding in the closet or attempting to escape from the bathroom.

[4] Another witness who was at the house when appellant's cousin arrived later testified that appellant's cousin knocked on the door but that the cousin left before appellant came out of his room.

4

At the time of appellant's 2013 trial, Jones had not seen appellant, who was supposed to be providing 24-hour care to his aunt, since the morning of May 17, 2010. He testified that appellant's family spent months trying to locate him because it was uncharacteristic for appellant to be missing. Eventually, Jones heard that appellant was in the Harris County jail.

Appellant's aunt had another caregiver, Maggie Bledsoe, who would come by the apartment to cook and clean for the aunt. Bledsoe testified at appellant's trial that she arrived no later than 7:20 a.m. that morning and that appellant had let her into the apartment as usual. Bledsoe testified that she normally leaves the door open when she enters the apartment and did so that morning. Bledsoe spoke with appellant in the kitchen before he went into his bedroom. Bledsoe testified that appellant usually left for work between 7:30 a.m. and 8:00 a.m. but she did not see anyone pick him up for work that morning. She heard appellant come back out of his room and into the bathroom, and the next thing she knew she saw a female run out the front door. Bledsoe testified appellant then came out of the bathroom, "went to the front door, went out and then came back in, went back in the room and then went back out the front door and left."

According to the complainant's testimony, after running away from appellant's apartment, she saw a friend driving past. The complainant flagged down her friend and obtained a ride to the nearby home of French, with whom the complainant had a close relationship. The complainant testified she arrived at French's house screaming and yelling about what had happened to her.

French testified that she heard someone yelling and screaming, but not knocking, and opened the door to find the complainant, who appeared "real scared and upset." The complainant was crying and "basically she was sick to her stomach," to a degree that French at one point thought the complainant was going

5

to throw up. French had never before seen the complainant in that emotional condition.

Over appellant's hearsay objection, the trial court permitted French to testify to statements the complainant made when she arrived at French's house. Without French asking her any questions, the complainant began mumbling "[he] wouldn't let me go, he wouldn't let me go" and "he had a knife." French, who did not know what was going on, became scared and dialed the police. While French was on the phone, she heard the complainant tell her daughter, who was also home, that someone had raped her. French testified that the complainant was hysterical and said "he had a hostage in the house" and "had a knife to her throat."

Overruling appellant's renewed hearsay objection, the trial court permitted French to respond to the State' question whether the complainant said where she had been the night before. French testified that the complainant "said her and her boyfriend had got into it and [appellant] took her phone and she couldn't call nobody and [French thought appellant] had maybe let her use the phone or something." Shortly after French's call, the police arrived and the complainant left with them.

Officer Clark, a police officer with the La Marque Police Department, testified that she was dispatched on suspicion of a hostage situation, but upon her arrival was advised that the call was for a sexual assault. Officer Clark spoke with the complainant at a gas station around 9:00 a.m., and testified that the complainant was "noticeably still crying because she was still upset" but it seemed like she had calmed down at that point. Within the hour, Officer Clark took the complainant to the hospital to get a sexual assault examination, leaving her in the care of a sexual assault nurse examiner ("SANE nurse").

The SANE nurse testified that the complainant had a half-centimeter abrasion under her left eye, an abrasion under her left nostril, and petechiae, or tiny red dots, on the midline of her neck.[5] According to the SANE nurse, petechiae are the "result of some sort of pressure applied that . . . caus[es] . . . capillaries to burst." The complainant demonstrated to the SANE nurse that she was choked using both thumbs to the front of her throat. The SANE nurse testified that the complainant also had tiny abrasions with pain on the front of her neck, and she experienced pain when touched on the back of the neck. There was also a tiny puncture on the complainant's neck that the complainant said was from a knife. The complainant also had a circular bruise next to her elbow, redness and pain to the top of her left hand, and abrasions on the fingers of her left hand that the complainant reported "were scratches . . . from tussling." The SANE nurse also performed an anogenital exam, during which she observed an abrasion to the complainant's perineum that the nurse testified was consistent with either consensual or nonconsensual sexual intercourse. The nurse testified that injuries are not typical in most sexual assault exams of post-puberty women, and that she observed them in only ten to fifteen percent of the exams she had performed.

DNA tests were later performed on samples the SANE nurse took from the complainant. One section of the complainant's underwear tested positive for the DNA indicators of three individuals. DNA analysis of a vaginal swab taken from the complainant tested positive for the DNA of two individuals. The DNA analyst testified that she could not exclude either appellant or the complainant as the two contributors of the DNA present in the vaginal swab. The DNA analyst also could not exclude the possibility that appellant's DNA was present on the tested section of the complainant's underwear.

---

[5] The complainant also had a swollen lip that she claimed was from her boyfriend hitting her, though he denied it.

7

Prior to trial, the State provided appellant with notice that the complainant, who was seventeen at the time of the offense, was under indictment in Galveston County for aggravated assault with a deadly weapon. The State also filed a motion in limine requesting that appellant approach the bench before introducing a prior conviction to impeach a witness. Appellant asked to introduce the indictment on the basis that it was a crime of moral turpitude involving an act of deliberate violence. Appellant represented that the complainant "got it worked out and pled guilty to [misdemeanor] assault with an affirmative finding of family violence."[6]

Although the trial court requested more information about what the complainant was actually accused of doing and the offense of which she was convicted, neither the indictment itself nor any plea agreement or judgment appear in our record. Instead, appellant's counsel told the trial court that he thought the deadly weapon referenced in the indictment was a razor blade. The State claimed the complainant's "stance" was that an argument with her boyfriend "turned into a mutual physical argument and that during that time she injured him," but that it "wasn't a deliberate act, it was a fight that turned into violence." The State also contended that the offense of assault causing bodily injury would encompass an intentional, knowing, or reckless state of mind and was therefore not necessarily deliberate violence. Appellant did not ask to question the complainant regarding the conviction in a hearing outside the presence of the jury. The trial court ruled the evidence inadmissible. Appellant did not renew his request to introduce the conviction during the complainant's testimony.

The jury convicted appellant of aggravated sexual assault. Because appellant also had a prior conviction for sexual assault of a child, he received a mandatory life sentence. This appeal followed.

---

[6] Appellant further described the conviction as assault causing bodily injury.

ANALYSIS

## I.     Sufficient evidence supports appellant's conviction for aggravated sexual assault.

Appellant's first issue on appeal challenges the sufficiency of the evidence to support his conviction. We hold the evidence is sufficient and overrule appellant's first issue.

In reviewing the sufficiency of the evidence to support a conviction, we determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Johnson v. State*, 364 S.W.3d 292, 293–294 (Tex. Crim. App. 2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The essential elements of the crime are defined by the hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). A hypothetically correct jury charge is one that "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the state's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.*

The fact-finder is the exclusive judge of the credibility of the witnesses and of the weight to be given to their testimony. *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010). Reconciliation of evidentiary conflicts is within the fact-finder's exclusive province. *Wyatt v. State*, 23 S.W.3d 18, 30 (Tex. Crim. App. 2000). We presume the fact finder resolved any inconsistencies in the testimony in favor of the verdict. *Curry v. State*, 30 S.W.3d 394, 06 (Tex. Crim. App. 2000).

A person commits the offense of aggravated sexual assault when he intentionally or knowingly "causes the penetration of the . . . sexual organ of another person by any means, without that person's consent" and "uses or exhibits

a deadly weapon in the course of the same criminal episode." Tex. Penal Code § 22.021(a)(1)(A)(i), (a)(2)(A)(iv) (West Supp. 2014). The indictment alleged that appellant caused the penetration of the complainant's sexual organ by his sexual organ, and that the weapon used or exhibited was a knife. An aggravated sexual assault is without the consent of the other person if the actor "compels the other person to submit or participate" either (1) "by the use of physical force or violence," or (2) "by threatening to use force or violence against the other person, and the other person believes that the actor has the present ability to execute the threat." *Id.* § 22.011(b)(1)–(2), 22.021(c). The Texas Code of Criminal Procedure provides that in a prosecution for aggravated sexual assault, a complainant's testimony can constitute sufficient evidence for conviction. Tex. Code Crim. Proc. Ann. art. 38.07. (West Supp. 2013); *Phillips v. State*, 362 S.W.3d 606, 611 (Tex. Crim. App. 2011) (noting that Article 38.07 authorizes conviction of certain sexual offenses on the victim's testimony alone).

Applying these standards, we conclude that the evidence is sufficient to support appellant's conviction. As detailed above, the complainant testified about the circumstances of the assault. To summarize, the complainant testified that the appellant lured her into his bedroom under false pretenses, secured the door with a wooden stick, grabbed her, took her pocket knife and held it to her neck, choked her, threatened to kill her and himself, and had intercourse with her multiple times despite her screams and commands for him to stop. This testimony supports the jury's finding that the appellant used or threatened to use physical force to compel the complainant to have intercourse with him, and that he used or exhibited a deadly weapon—the complainant's knife—in the course of committing the offense.

10

The State also presented other evidence that corroborated the complainant's testimony. A recording of a 9-1-1 call from French, on which French identified the complainant's voice screaming in the background, was published to the jury. Although the recording lists the time of the 9-1-1 call as 8:42 a.m., French testified she thought she made the call earlier than that because the complainant arrived right after her niece left to catch the school bus. French testified that the call could have been anywhere between 7:00 a.m. and 9:00 a.m. This timing was consistent with the complainant's testimony that she left appellant's apartment around 7:00 a.m. and Bledsoe's testimony that a woman ran out of the apartment a minimum of fifteen to twenty minutes after she arrived,[7] and that she could have arrived as late as 7:20 a.m.

The DNA analyst testified that profiles based on DNA taken from a vaginal swab and from the complainant's underwear were both consistent with appellant being a contributor of DNA, corroborating the complainant's testimony that the two had intercourse. The jury also heard the SANE nurse testify that the complainant told her she was choked, and that the complainant's injuries were consistent with being choked. The SANE nurse also testified regarding other injuries suffered by the complainant that are suggestive of physical struggle and the use of a knife.

The State also presented other circumstantial evidence that appellant was involved in the assault. Bledsoe testified that appellant did not leave for work that morning as usual, and that a woman ran out of the apartment after she left the front door open. She also testified that Jones, appellant's cousin, visited the apartment for fifteen to twenty minutes while she was there but left before the woman ran

---

[7] Bledsoe testified that Jones, appellant's cousin, visited the apartment for fifteen to twenty minutes while she was there but left before the woman ran out of the house.

out. Jones testified that after that morning, appellant uncharacteristically did not return to the house or try to contact his family despite his role as his aunt's caregiver.

Appellant points to inconsistencies in the complainant's testimony and contends the evidence was insufficient because the inconsistencies undermined her credibility. For example, appellant presented evidence that the bathroom in his apartment does not have a window. This evidence conflicted with portions of the complainant's testimony in which she claimed she could not escape through the bathroom window because it was sealed shut. Appellant also presented evidence that Jones, Bledsoe, and appellant's aunt would have heard the complainant scream if she were being held in his bedroom, but that neither Bledsoe nor his cousin heard any screams.[8] The jury was not required to disregard the entirety of the complainant's testimony, however, simply because parts of it were not consistent with other evidence. *See Lee v. State*, 176 S.W.3d 452, 458 (Tex. App.—Houston [1st Dist.] 2004), *aff'd*, 206 S.W.3d 620 (Tex. Crim. App. 2006).

Appellant does not challenge the existence of evidence suggesting the encounter was nonconsensual, only the credibility of that evidence in light of these inconsistencies. But the fact-finder is the exclusive judge of the credibility of witnesses and of the weight to be given to their testimony, *Brooks*, 323 S.W.3d at 899, and we presume that the jury resolved any inconsistencies in the evidence in favor of the verdict. *Curry*, 30 S.W.3d at 06. On this record, a rational trier of fact could have concluded that appellant used or threatened physical force and exhibited a deadly weapon to compel the complainant to have sexual intercourse with him. We therefore hold the evidence is sufficient to support appellant's conviction and overrule his first issue.

_____

[8] Appellant's aunt died prior to his trial.

12

**II.    Appellant failed to show that the trial court committed reversible error in excluding the complainant's indictment or admitting hearsay.**

Appellant's second and third issues on appeal challenge the trial court's rulings admitting and excluding evidence.  We consider each issue in turn.

### A.    Standard of review

We review a trial court's decision to admit or exclude evidence for an abuse of discretion.  *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011).  A trial court's ruling is an abuse of discretion if it is arbitrary or unreasonable.  *State v. Mechler*, 153 S.W.3d 435, 439 (Tex. Crim. App. 2005).  The trial court does not abuse its discretion unless its ruling is so clearly wrong as to lie outside the zone within which reasonable people could disagree.  *Tillman*, 354 S.W.3d at 435.  We will uphold the trial court's decision on any theory applicable to the case.  *State v. Esparza*, 413 S.W.3d 81, 85 (Tex. Crim. App. 2013); *Salas v. State*, 629 S.W.2d 796, 799 (Tex. App.—Houston [14th Dist.] 1981, no pet.).

If an appellant demonstrates error, he must also show that he was harmed by the error to obtain reversal.  *See* Tex. R. App. P. 44.2; *Torres v. State*, 424 S.W.3d 245, 260 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd).   The erroneous exclusion of evidence is generally non-constitutional error.  *Walters v. State*, 247 S.W.3d 204, 219 (Tex. Crim. App. 2007).  The exclusion of evidence that "forms such a vital portion of the case that exclusion effectively precludes the defendant from presenting a defense," however, may rise to the level of a constitutional violation.  *Id.* (internal quotation marks omitted).

We disregard nonconstitutional errors unless they affect the defendant's substantial rights.  Tex. R. App. P. 44.2(b); *Potier v. State*, 68 S.W.3d 657, 666 (Tex. Crim. App. 2002).  Errors affecting a defendant's substantial rights are those that have a substantial and injurious effect or influence on the jury's determination

of its verdict. *Coble v. State,* 330 S.W.3d 253, 280 (Tex. Crim. App. 2010). Evidence that is erroneously admitted or excluded because of non-constitutional error but did not influence the jury or had but a slight effect on its deliberations will be considered harmless. *Id.*

We review the whole record in determining the effect of the improper admission or exclusion of evidence on the jury's decision. *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000). Our assessment includes consideration of "any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case." *Id.* The erroneous admission of evidence is not harmful when substantially similar evidence was received without objection at another point in the trial. *See Coble*, 330 S.W.3d at 282; *Klein v. State*, 273 S.W.3d 297, 318 (Tex. Crim. App. 2008).

**B.    The trial court did not abuse its discretion in excluding evidence of the complainant's indictment.**

Appellant contends in his second issue that the trial court committed reversible error by improperly excluding impeachment evidence against the complaining witness. When the ruling is one excluding evidence, the substance of the evidence must be made known to the court by offer or must be apparent from the context within which questions were asked. Tex. R. Evid. 103. If the defendant wishes to impeach the witness's general credibility, the defendant must "establish the general subject matter on which he or she desired to examine the witness and, if challenged, show on the record why such should be admitted into evidence." *LaHood v. State*, 171 S.W.3d 613, 622 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd).

14

It is the proponent's burden to establish that the proffered evidence overcomes any stated objections. *Vinson v. State*, 252 S.W.3d 336, 340 (Tex. Crim. App. 2008). When the evidentiary purpose is to impeach a witness with evidence that the witness has been convicted of a crime, the proponent must establish (1) that "the crime was a felony or involved moral turpitude," and (2) that "the probative value of admitting this evidence outweighs its prejudicial effect to a party." Tex. R. Evid. 609; *Theus v. State*, 845 S.W.2d 874, 879-80 (Tex. Crim. App. 1992). Rule 609 provides the trial court with discretion to determine the second element, but not the first. *See Theus*, 845 S.W.2d at 879 (holding that "Rule 609 provides that felony [or crimes of moral turpitude] convictions *shall* be admissible" if the court determines the probative value of a conviction outweighs its prejudicial effect).

As an initial matter, it is unclear from our sparse record whether the complainant's conviction was for a crime of moral turpitude. Appellant contends the trial court incorrectly determined that a misdemeanor assault conviction with an affirmative finding of family violence was not a crime of moral turpitude because the court was "hung up on the issue of 'deliberate violence' versus 'violence.'" Our review of the exercise of the trial court's discretion is not limited to the trial court's articulated reasoning, however, and we will uphold the trial court's decision as long as it is correct on any theory of law applicable to the case. *Salas*, 629 S.W.2d at 798–99.

Although some cases have used the phrase "deliberate violence" in describing moral turpitude, *see e.g.*, *Escobedo v. State*, 202 S.W.3d 844, 848 (Tex. App.—Waco 2006),[9] the Court of Criminal Appeals and many other courts have

---

[9] Appellant relied on *Escobedo v. State* at trial, in which the Tenth Court of Appeals cites a juvenile adjudication and an attorney discipline case to support its proposition that moral turpitude has been defined in a variety of ways, including encompassing crimes involving

15

concluded that misdemeanor simple assault is not a crime of moral turpitude. *See, e.g.*, *Garza v. State*, 160 S.W.2d 926, 927 (Tex. Crim. App. 1942); *Gray v. State*, 86 S.W. 764, 765 (Tex. Crim. App. 1905); *Brittain v. State*, 37 S.W. 758, 759 (Tex. Crim. App. 1896); *Patterson v. State*, 783 S.W.2d 268, 271 (Tex. App.—Houston [14th Dist.] 1989, pet. ref'd). An exception has developed under which misdemeanor assaults are considered crimes of moral turpitude if the aggressor is male and the victim is female. *See, e.g.*, *Trippell v. State*, 535 S.W.2d 178, 180 (Tex. Crim. App. 1976); *Knox v. State*, 487 S.W.2d 322, 326 n. 2 (Tex. Crim. App. 1972), *overruled on other grounds in Bradford v. State*, 608 S.W.2d 918 (Tex. Crim. App. 1980); *Lopez v. State*, 990 S.W.2d 770, 778 (Tex. App.—Austin 1999, no pet.); *Hardeman v. State*, 868 S.W.2d 404, 407 (Tex. App.—Austin 1993, pet. ref'd); *cf. Chambliss v. State*, No. 14-10-00035-CR, 2011 WL 665323, at *2-3 (Tex. App.—Houston [14th Dist.] Feb. 24, 2011, pet. ref'd) (mem. op., not designated for publication) (holding dating violence is not crime of moral turpitude when victim is male).

We need not decide whether an affirmative finding that the female complainant here committed family violence would convert her misdemeanor assault conviction into a crime of moral turpitude,[10] however, because we conclude

---

"dishonesty, fraud, deceit, misrepresentation, or deliberate violence." *Escobedo*, 202 S.W.3d at 848. The case itself, however, did not address what constitutes "deliberate violence" or whether all crimes involving "deliberate violence" will constitute moral turpitude. *Id.*

[10] At least one court has held that a misdemeanor conviction for violation of a protective order is a crime of moral turpitude when the underlying uncharged offense is one of family violence, specifically an assault by a man against a woman and additional threats of assault. *See Ludwig v. State*, 969 S.W.2d 22, 29 (Tex. App.—Fort Worth 1998, pet. ref'd) (noting that the Legislature "has specifically targeted family violence *and is particularly concerned with repeat or habitual offenders*" (emphasis added)). We note that under current law, assault is a third-degree felony—and thus available for impeachment—if the offense is committed against a family member or someone with whom the defendant has a dating relationship and certain other requirements are met. Tex. Penal Code Ann. § 22.01(b)(2); Tex. Fam. Code Ann. §§ 71.0021, 71.003 (West 2014).

the trial court did not abuse its discretion in concluding that the probative value of the excluded evidence did not outweigh its prejudicial effect. The Court of Criminal Appeals has developed a non-exclusive list of factors to be considered in weighing the probative value and prejudicial effect of a defendant's prior conviction, including "(1) the impeachment value of the prior crime, (2) the temporal proximity of the past crime relative to the charged offense and the witness'[s] subsequent history, (3) the similarity between the past crime and the offense being prosecuted, (4) the importance of the defendant's testimony, and (5) the importance of the credibility issue." *Theus*, 845 S.W.2d at 880; *Vasquez v. State*, 417 S.W.3d 728, 732 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd). These factors are also relevant when a defendant wishes to impeach a prosecution witness with a prior conviction. *Theus*, 845 S.W.2d at 880.

When the only evidence is the testimony of a witness, the importance of that witness's credibility and testimony escalates, and therefore so does the need to allow an opportunity to impeach the witness's credibility. *See Theus*, 845 S.W.2d at 881; *Huerta v. State*, 359 S.W.3d 887, 894 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *LaHood*, 171 S.W.3d at 621. Even where as many as four of the five factors favor the proponent's position, however, the unique facts of a case may "compel the conclusion that the lack of impeachment value overrides the other four factors." *Theus*, 845 S.W.2d at 881.

These factors show that the trial court's decision to exclude the complainant's prior conviction was not outside the zone of reasonable disagreement. Regarding the importance of the complainant's testimony, the complainant was not the State's only witness. Bledsoe testified that a woman ran out of appellant's apartment, providing at least circumstantial evidence that the complainant was running away. The SANE nurse's testimony provided evidence

17

that the complainant had injuries consistent with being choked, and the DNA analyst's testimony established an independent basis for the jury to conclude that the complainant and appellant had sexual intercourse. As appellant points out, however, the complainant's statements to others were the ultimate source of all evidence attributing her injuries to a nonconsensual sexual encounter with appellant. *Cf. Huerta*, 359 S.W.3d at 894; *LaHood v. State*, 171 S.W.3d at 621. The complainant's credibility was therefore an issue of significance in appellant's trial.

Nevertheless, appellant has not shown that the complainant's conviction for assault—a crime of violence rather than deception—carried sufficient probative value to outweigh its substantial prejudicial effect. *See Theus*, 845 S.W.2d at 881 ("The impeachment value of crimes that involve deception is higher than crimes that involve violence, and the latter have a higher potential for prejudice."). Appellant spent very little time at trial developing his rationale for introducing the complainant's conviction, thereby limiting the scope of information the trial court had to balance the probative value and prejudicial effect of the evidence. Other than appellant's assertion that the conviction qualifies as one involving moral turpitude and his generic reference to the appellant's credibility, the sole potential probative value appellant identifies on appeal is that the conviction suggests the complainant "knew about sharp instruments which can cut, and the effect that introducing such implements can have on intense personal situations."

We conclude that the conviction's probative value in establishing that the complainant knew about sharp instruments is marginal, at best, given that she admitted to carrying a pocketknife on her person when she encountered appellant. Furthermore, the complainant admitted that she introduced the weapon into this encounter when appellant locked her in his room. Nothing about the complainant's

18

previous familiarity with sharp instruments or their introduction suggests that she had any pre-existing bias against appellant or motive to lie about the nonconsensual nature of this encounter. *Cf. Simmons v. State*, 548 S.W.2d 386, 388 (Tex. Crim. App. 1977) ("[G]reat latitude is allowed the accused in showing any fact, including pending charges, *which would tend to establish ill feeling, bias, motive, and animus on the part of any witness testifying against him*." (emphasis added)). The impeachment value of the conviction was thus quite low, and the trial court could reasonably conclude that introducing it was unlikely to impact the jury's perception of appellant's truthfulness significantly.

Appellant also cannot rely on either the second or third factors to support admission of the complainant's conviction. Appellant offered no evidence as to the timing of the complainant's offense or the resulting conviction. Indeed, although the complainant was only seventeen at the time of this offense, appellant did not address whether her earlier "conviction" was in fact a juvenile adjudication and thus inadmissible for general impeachment purposes. Tex. R. Evid. 609(d); *Gilmore v. State*, 871 S.W.2d 848, 850 (Tex. App.—Houston [14th Dist.] 1994, no pet.). There is also a lack of evidence that the complainant's involvement in her own offense and appellant's offense were similar. Although appellant contends on appeal that the complainant "pled guilty to an offense involving a razor blade," appellant claimed at trial only that the indictment mentioned a deadly weapon, not that the plea bargain or conviction also mentioned one. Appellant did not offer evidence that a razor blade or other deadly weapon was involved. Furthermore, appellant concedes that the complainant's conviction lacked any sexual element.

Given these factors, a determination that the weak impeachment value of the complainant's conviction and its lack of proximity or similarity outweigh its importance is within the zone of reasonable disagreement. We therefore overrule

19

appellant's second issue.

### C. Appellant has failed to show harm from the admission of hearsay that was not an excited utterance.

Appellant contends in his third issue that the trial court committed reversible error by improperly admitting hearsay evidence under the excited utterance exception. The Texas Rules of Evidence define hearsay as a statement, other than one made by the declarant while testifying at the trial or hearing, offered into evidence to prove the truth of the matter asserted. Tex. R. Evid. 801(d). Although hearsay is generally inadmissible, Rule 803 provides an exception for admitting excited utterances: statements "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Tex. R. Evid. 803(2); *see McCarty v. State*, 257 S.W.3d 238, 239 (Tex. Crim. App. 2008). The basis for the excited utterance exception is a "psychological one, namely, the fact that when a man is in the instant grip of violent emotion, excitement or pain, he ordinarily loses the capacity for reflection necessary to the fabrication of a falsehood." *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003) (internal quotation marks omitted).

In determining whether a statement falls within the excited utterance exception, the court should consider whether "(1) the 'exciting event' [is] startling enough to evoke a truly *spontaneous* reaction from the declarant; (2) the reaction to the startling event [is] quick enough to avoid the possibility of fabrication; and (3) the resulting statement [is] sufficiently 'related to' the startling event, to ensure the reliability and trustworthiness of the statement." *McCarty*, 257 S.W.3d at 241. The court may also consider factors such as "the length of time between the occurrence and the statement, the nature of the declarant, whether the statement is made in response to a question, and whether the statement is self-serving."

20

*Apolinar v. State*, 155 S.W.3d 184, 187 (Tex. Crim. App. 2005).

The critical determination is whether the declarant was still dominated by the emotions, excitement, fear, or pain of the event or condition at the time of the statement. *Salazar v. State*, 38 S.W.3d 141, 154 (Tex. Crim. App. 2001). The statement must be made "under such circumstances as would reasonably show that it resulted from impulse rather than reason and reflection." *Fowler v. State*, 379 S.W.2d 345, 347 (Tex. Crim. App. 1964).

Here, appellant complains of two rulings permitting witnesses to repeat statements that he contends did not qualify as excited utterances. We examine each statement in turn.

### 1. The trial court did not abuse its discretion in determining that French testified as to the complainant's excited utterances.

Appellant's first complaint relates to French's testimony that the complainant told her appellant had raped her, held her against her will, and used a knife. Appellant contends these statements were the product of reason and reflection rather than impulse because many hours had passed from the time of the assault and there was no evidence showing that the complainant was still dominated by the emotions, excitement, fear, or pain of the event, only evidence that the complainant was yelling and screaming. Appellant asserts that Bledsoe testified the complaining witness was not yelling or screaming when she ran out of the house, so the yelling and screaming started after she left the house.

Contrary to appellant's argument, the record contains evidence that the complainant was still dominated by the emotions, excitement, fear, or pain of the event when she made the statements to which French testified over appellant's objection. French testified that the complainant looked "sick to her stomach" and

that she had never seen the complainant so scared or upset. French's testimony suggests that the complainant's initial statements—mumbling that "he wouldn't let me go" and "he had a knife," without identifying who he was or what had happened—were unintelligible enough that French, who did not know what was going on, became scared as well. French described the complainant as "hysterical." The jury was not required to believe Bledsoe's testimony that the complainant was not yelling or screaming when she ran out of appellant's house, *see Lee*, 176 S.W.3d at 458, but regardless, the mere fact that the complainant's emotions did not begin to manifest as yelling and screaming until after the complainant ran away does not establish that the complainant was not under stress at the time she escaped.[11] Appellant's contentions regarding the State's motive for introducing French's testimony for its dramatic effect do not counter this evidence that appellant was dominated by her emotions to dramatic effect when she spoke with French.

Furthermore, although the sexual assault itself may have occurred more than a few hours earlier, the assault was not the only "startling event" that could have dominated the complainant's emotions. The complainant's testimony and other evidence shows that she was also intensely affected by being violently held against her will in appellant's apartment. The complainant perceived appellant's statement that she had "one more time" to mean that he would kill her if she again attempted to escape or attract attention from others. According to the complainant's own testimony, and the combination of Bledsoe and French's testimony, under an hour had passed between the complainant's escape and her arrival at French's house. Given the traumatic nature of the complainant's confinement and the relatively

---

[11] Officer Clark also testified that when she met the complainant nearly an hour later, although it seemed like the complainant had calmed down at that point, the complainant was "noticeably still crying because she was still upset."

22

short time between her escape and her statements to French, we conclude it was not outside the zone of reasonable disagreement to conclude that the complainant was still under the stress of her ordeal at appellant's house when she made those statements.

For these reasons, we hold the trial court did not abuse its discretion in finding that the complainant was still dominated by the emotions, excitement, fear, or pain of her ordeal at appellant's house when she made the statements to which French testified. French's testimony was therefore properly admitted over appellant's hearsay objection.

### 2. Appellant failed to show he was harmed by the admission of Daniels's testimony regarding the complainant's phone call.

Appellant also contends that the trial court erred in allowing the complainant's then-boyfriend, Daniels, to testify regarding a phone call he received from the complainant while she was at the hospital for her sexual assault examination. Appellant contends that the complainant's statements blaming Daniels for her assault indicate that she had had an "opportunity to gather her thoughts, assess her situation, and apply reason and reflection." The State defends the trial court's determination that the complainant's statements to Daniels were excited utterances because the complainant's excited state may have been revived or exacerbated by returning to the scene of her assaults with Officer Clark and then undergoing the sexual assault assessment. We need not resolve this dispute, however. Assuming without deciding that the complainant's statements to Daniels during the phone call were not excited utterances, appellant has failed to show that he was harmed by their admission in light of other evidence that was properly admitted.

At most, Daniels testified over objection that (1) the complainant was "all dramatic and screaming;" (2) the complainant told Daniels he was stupid; and (3) the complainant told Daniels it was his fault she was raped because he had broken her phone. Although Daniels's testimony is consistent with other witness's testimony as to what the complainant alleged happened, it neither adds new information nor presents that information in a more persuasive light. Daniels simply repeated information that the complainant herself provided to the jury. Furthermore, other witnesses provided essentially the same information either without objection or under a permissible hearsay exception. For example, French also testified that the complainant was yelling and screaming, and that the complainant claimed appellant had offered to let her use his phone after Daniels removed the battery from her phone. In addition, the SANE nurse's testimony showed that the complainant had alleged to others that she had been raped and that she had injuries consistent with her allegation.

Given this other evidence, appellant has failed to show that any error in admitting Daniels's challenged testimony had a substantial and injurious effect on the jury's deliberation. We therefore overrule appellant's third issue.

## CONCLUSION

Having overruled each of appellant's issues, we affirm the judgment of the trial court.


/s/         J. Brett Busby
                  Justice


Panel consists of Justices McCally, Busby, and Donovan.
Do Not Publish — TEX. R. APP. P. 47.2(b).